CABELL, ACTING CHIEF PROBATION OFFICER
OF LOS ANGELES COUNTY, ET AL. *v.*
CHAVEZ-SALIDO ET AL.

No. 80–990.   Argued November 3, 1981—Decided January 12, 1982

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and POWELL, REHNQUIST, and O'CONNOR, JJ., joined. BLACKMUN, J., filed a dissenting opinion, in which BRENNAN, MARSHALL, and STEVENS, JJ., joined, *post,* p. 447.

*William F. Stewart* argued the cause for appellants. With him on the briefs was *John H. Larson.*

*Mary S. Burdick* argued the cause for appellees. With her on the brief was *Dan Stormer.**

JUSTICE WHITE delivered the opinion of the Court.

In this case we once again consider a citizenship requirement imposed by a State on those seeking to fill certain governmental offices. California Gov't Code Ann. § 1031(a) (West 1980) requires "public officers or employees declared by law to be peace officers" to be citizens of the United States. California Penal Code Ann. § 830.5 (West Supp. 1981) provides that probation officers and deputy probation officers are "peace officers." A three-judge District Court of the Central District of California held the California requirement unconstitutional both on its face and as applied to the appellees, who sought positions as Deputy Probation Officers. 490 F. Supp. 984.

---

*Robert Newman* filed a brief for Service Employees International Union, Local 535, as *amicus curiae* urging affirmance.

*Peter A. Schey, Fred Okrand,* and *Mary K. Gillespie* filed a brief for the League of United Latin American Citizens as *amicus curiae.*

## I

Appellees were, at the time the complaint was filed, lawfully admitted permanent resident aliens living in Los Angeles County, Cal.[1] Each applied unsuccessfully for positions as Deputy Probation Officers with the Los Angeles County Probation Department.[2] With respect to two of the three appellees, the parties stipulated that the failure to obtain the positions sought was the result of the statutory citizenship requirement.[3]

Appellees filed a complaint in the United States District Court for the Central District of California challenging the constitutionality of the citizenship requirement under the Equal Protection Clause of the Fourteenth Amendment and 42 U. S. C. §§ 1981 and 1983. Named as defendants were certain individual county officials, in their official capacity, and the County of Los Angeles.[4]

---

[1] One of the appellees, Chavez-Salido, subsequently became a citizen. By that time, however, there were no longer any openings for the job he had previously been denied on the grounds of his noncitizenship. Appellees, at the time they applied for the positions in question, were all lawfully present, resident aliens. Therefore, we do not consider, and intimate no opinion about, any limits the Constitution may place upon state action directed at aliens who are here without the permission of the Federal Government or who, if legally here, are not residents of the State.

[2] Under the California statute, the kinds of responsibilities of deputy probation officers are the same as those of probation officers and both are considered "peace officers." Cal. Penal Code Ann. § 830.5 (West Supp. 1981). This opinion, therefore, will refer simply to "probation officers" in discussing the positions at issue.

[3] The third appellee, Bohorquez, claimed only that he failed to appeal a test score that disqualified him, because he had been informed that without citizenship an appeal would be useless. As relief in this suit, Bohorquez sought only an opportunity to take a new examination.

[4] Although the individual defendants did not contest the jurisdiction of the federal court, the county did. In their complaint, appellees waived any claim against the county under 42 U. S. C. § 1983—the complaint was

Appellees alleged unconstitutional discrimination against aliens, impermissible infringement upon their constitutional right to travel, and unconstitutional interference with Congress' plenary power to regulate aliens. They sought declaratory and injunctive relief, as well as attorney's fees and damages for two of the plaintiffs. A three-judge court was properly convened. 28 U. S. C. §§ 2281 (1970 ed.), 2284.[5]

In February 1977, the District Court concluded that the statutory citizenship requirement was unconstitutional both on its face and as applied. *Chavez-Salido* v. *Cabell*, 427 F. Supp. 158. That decision rested entirely on appellees' arguments under the Equal Protection Clause; it did not reach the right to travel and federal pre-emption claims. This Court vacated and remanded that judgment for further consideration in light of *Foley* v. *Connelie*, 435 U. S. 291 (1978), which upheld a New York statute requiring state troopers to be United States citizens. *County of Los Angeles* v. *Chavez-Salido*, 436 U. S. 901 (1978). On remand, the District Court reconsidered its previous position in light of both *Foley, supra,* and *Ambach* v. *Norwick*, 441 U. S. 68 (1979),

---

filed before this Court's decision in *Monell* v. *New York City Dept. of Social Services*, 436 U. S. 658 (1978), which held that such an action could be brought against a county. Appellees argued, and the District Court agreed, that they did have a claim against the county directly under the Fourteenth Amendment and under 42 U. S. C. § 1981, with jurisdiction in the Federal District Court under 28 U. S. C. § 1331(a) because there was more than $10,000 in controversy. In its second opinion, the District Court readopted its earlier jurisdictional holdings and declined to release appellees from their previous waiver of a possible claim against the county under § 1983. Given our resolution of the merits and because jurisdiction over the individual defendants is clear, we need not evaluate or otherwise accept the District Court's jurisdictional findings with respect to the county.

[5] Congress has since limited the availability of three-judge courts, The Three-Judge Court Amendments of 1976, Pub. L. 94–381, 90 Stat. 1119. This case, however, is not affected by those changes, which do not apply to actions commenced before the date of the new statute's enactment.

which held that a State may refuse to employ as elementary and secondary school teachers aliens who are eligible for United States citizenship but fail to seek naturalization. With Judge Curtis dissenting, the court found its prior views still valid and convincing. It, therefore, came to the identical conclusion that the California statutory scheme was constitutionally invalid both facially and as applied.

We noted probable jurisdiction, 450 U. S. 978 (1981), and now reverse.

## II

Over the years, this Court has many times considered state classifications dealing with aliens. See, *e. g.*, *Ambach v. Norwick, supra; Nyquist v. Mauclet*, 432 U. S. 1 (1977); *Foley v. Connelie, supra; Examining Board v. Flores de Otero*, 426 U. S. 572 (1976); *In re Griffiths*, 413 U. S. 717 (1973); *Sugarman v. Dougall*, 413 U. S. 634 (1973); *Graham v. Richardson*, 403 U. S. 365 (1971); *Takahashi v. Fish & Game Comm'n*, 334 U. S. 410 (1948); *Crane v. New York*, 239 U. S. 195 (1915); *Heim v. McCall*, 239 U. S. 175 (1915); *Truax v. Raich*, 239 U. S. 33 (1915); *Yick Wo v. Hopkins*, 118 U. S. 356 (1886). As we have noted before, those cases "have not formed an unwavering line over the years." *Ambach v. Norwick, supra*, at 72. But to say that the decisions do not fall into a neat pattern is not to say that they fall into no pattern. In fact, they illustrate a not unusual characteristic of legal development: broad principles are articulated, narrowed when applied to new contexts, and finally replaced when the distinctions they rely upon are no longer tenable.

In *Yick Wo v. Hopkins, supra*, the Court held both that resident aliens fall within the protection of the Equal Protection Clause of the Fourteenth Amendment and that the State could not deny to aliens the right to carry on a "harmless and useful occupation" available to citizens. Although *Yick Wo* proclaimed that hostility toward aliens was not a permissible

ground for a discriminatory classification, it dealt only with a situation in which government had actively intervened in the sphere of private employment. In a series of later cases it became clear that *Yick Wo* did not mean that the State had to be strictly neutral as between aliens and citizens: The Court continued to uphold the right of the State to withhold from aliens public benefits and public resources. *Terrace* v. *Thompson,* 263 U. S. 197 (1923) (ownership of land); *Heim* v. *McCall, supra* (employment on public works projects); *Patsone* v. *Pennsylvania,* 232 U. S. 138 (1914) (taking of wild game).

This distinction between government distribution of public resources and intervention in the private market was clearly established as the principle by which state regulations of aliens were to be evaluated in *Truax* v. *Raich, supra,* which struck down a state statute requiring all employers of more than five workers to employ "not less than eighty (80) per cent qualified electors or native born citizens of the United States:"

> "The discrimination defined by the act does not pertain to the regulation or distribution of the public domain, or of the common property or resources of the people of the State, the enjoyment of which may be limited to its citizens as against both aliens and citizens of other States." *Id.,* at 39–40.

This public/private distinction, the "special public interest" doctrine, see *Graham* v. *Richardson, supra,* at 372, 374; *Sugarman* v. *Dougall, supra,* at 643, 644, was challenged in *Takahashi* v. *Fish & Game Comm'n, supra,* which held that California could not bar lawfully resident aliens from obtaining commercial fishing licenses:

> "To whatever extent the fish in the three-mile belt off California may be 'capable of ownership' by California, we think that 'ownership' is inadequate to justify California in excluding any or all aliens who are lawful residents

of the State from making a living by fishing in the ocean off its shores while permitting all others to do so." *Id.*, at 421.

As the principle governing analysis of state classifications of aliens, who are lawful residents, the distinction was further eroded in *Graham* v. *Richardson, supra,* which read *Takahashi* as "cast[ing] doubt on the continuing validity of the special public-interest doctrine in all contexts," 403 U. S., at 374, and held that a State could not distinguish between lawfully resident aliens and citizens in the distribution of welfare benefits. Returning to *Yick Wo*'s holding that lawfully present aliens fall within the protection of the Equal Protection Clause and citing the more recent theory of a two-tiered equal protection scrutiny, *Graham* implied that there would be very few—if any—areas in which a State could legitimately distinguish between its citizens and lawfully resident aliens:

> "Aliens as a class are a prime example of a 'discrete and insular' minority . . . for whom . . . heightened judicial solicitude is appropriate. Accordingly, it was said in *Takahashi*, 334 U. S., at 420, that 'the power of a state to apply its laws exclusively to its alien inhabitants as a class is confined within narrow limits.'" 403 U. S., at 372.

The cases through *Graham* dealt for the most part with attempts by the States to retain certain economic benefits exclusively for citizens. Since *Graham*, the Court has confronted claims distinguishing between the economic and sovereign functions of government. This distinction has been supported by the argument that although citizenship is not a relevant ground for the distribution of economic benefits, it is a relevant ground for determining membership in the political community. "We recognize a State's interest in establishing its own form of government, and in limiting participation in that government to those who are within 'the basic conception of a political community.'" *Sugarman* v.

*Dougall,* 413 U. S., at 642. While not retreating from the position that restrictions on lawfully resident aliens that primarily affect economic interests are subject to heightened judicial scrutiny, *ibid.; In re Griffiths, supra; Examining Board* v. *Flores de Otero, supra,* we have concluded that strict scrutiny is out of place when the restriction primarily serves a political function: "[O]ur scrutiny will not be so demanding where we deal with matters resting firmly within a State's constitutional prerogatives [and] constitutional responsibility for the establishment and operation of its own government, as well as the qualifications of an appropriately designated class of public office holders." *Sugarman* v. *Dougall, supra,* at 648. We have thus "not abandoned the general principle that some state functions are so bound up with the operation of the State as a governmental entity as to permit the exclusion from those functions of all persons who have not become part of the process of self-government." *Ambach* v. *Norwick,* 441 U. S., at 73–74. And in those areas the State's exclusion of aliens need not "clear the high hurdle of 'strict scrutiny,' because [that] would 'obliterate all the distinctions between citizens and aliens, and thus depreciate the historic value of citizenship.'" *Foley* v. *Connelie,* 435 U. S., at 295 (citation omitted).[6]

The exclusion of aliens from basic governmental processes is not a deficiency in the democratic system but a necessary consequence of the community's process of political self-definition. Self-government, whether direct or through representatives, begins by defining the scope of the community of the governed and thus of the governors as well: Aliens are by

---

[6] At times the dissent seems to imply that our cases do not establish a two-tiered standard of review—*e. g., "[Sugarman]* did not condone a looser standard for review of classifications barring aliens from 'political jobs.'" *Post,* at 453. At other times, however, the dissent explicitly refers to the "*Sugarman* exception" as requiring "[l]ess demanding scrutiny . . . for statutes deriving from 'a State's historical power to exclude aliens from participation in its democratic political institutions.'" *Post,* at 456.

definition those outside of this community. Judicial incursions in this area may interfere with those aspects of democratic self-government that are most essential to it. This distinction between the economic and political functions of government has, therefore, replaced the old public/private distinction. Although this distinction rests on firmer foundations than the old public/private distinction, it may be difficult to apply in particular cases.

*Sugarman* advised that a claim that a particular restriction on legally resident aliens serves political and not economic goals is to be evaluated in a two-step process. First, the specificity of the classification will be examined: a classification that is substantially overinclusive or underinclusive tends to undercut the governmental claim that the classification serves legitimate political ends. The classification in *Sugarman* itself—all members of the competitive civil service—could not support the claim that it was an element in "the State's broad power to define its political community," 413 U. S., at 643, because it indiscriminately swept in menial occupations, while leaving out some of the State's most important political functions. Second, even if the classification is sufficiently tailored, it may be applied in the particular case only to "persons holding state elective or important nonelective executive, legislative, and judicial positions," those officers who "participate directly in the formulation, execution, or review of broad public policy" and hence "perform functions that go to the heart of representative government." *Id.*, at 647.[7] We must therefore inquire whether the "posi-

---

[7] The full quotation from *Sugarman* is as follows:

" '[E]ach State has the power to prescribe the qualifications of its officers and the manner in which they shall be chosen.' *Boyd* v. *Nebraska ex rel. Thayer,* 143 U. S. 135, 161 (1892). See *Luther* v. *Borden,* 7 How. 1, 41 (1849); *Pope* v. *Williams,* 193 U. S. 621, 632–633 (1904). Such power inheres in the State by virtue of its obligation, already noted above, 'to preserve the basic conception of a political community.' *Dunn* v. *Blumstein,* 405 U. S., at 344. And this power and responsibility of the State applies,

tion in question . . . involves discretionary decisionmaking, or execution of policy, which substantially affects members of the political community." *Foley* v. *Connelie, supra,* at 296.

The restriction at issue in this case passes both of the *Sugarman* tests.

## III

Appellees argue, and the District Court agreed, that Cal. Gov't Code Ann. § 1031(a) (West 1980), which requires all state "peace officers" to be citizens, is unconstitutionally overinclusive: "Section 1031(a) is void as a law requiring citizenship which 'sweeps too broadly.'" 490 F. Supp., at 986.[8] The District Court failed to articulate any standard in reaching this conclusion. Rather, it relied wholly on its belief that

---

not only to the qualifications of voters, but also to persons holding state elective or important nonelective executive, legislative, and judicial positions, for officers who 'participate directly in the formulation, execution, or review of broad public policy perform functions that go to the heart of representative government.'" 413 U. S., at 647.

This language is far reaching and no limits on it were suggested by *Sugarman* itself: almost every governmental official can be understood as participating in the execution of broad public policies. The limits on this category within which citizenship is relevant to the political community are not easily defined, but our cases since *Sugarman—Foley* v. *Connelie,* 435 U. S. 291 (1978), and *Ambach* v. *Norwick,* 441 U. S. 68 (1979)—suggest that this Court will not look to the breadth of policy judgments required of a particular employee. Rather, the Court will look to the importance of the function as a factor giving substance to the concept of democratic self-government.

[8] Both the District Court and the parties mistakenly refer to this argument as one based on the constitutional doctrine of "overbreadth." "Overbreadth" is a doctrine of standing applicable in certain First Amendment cases and under which litigants may assert the rights of others not presently before the court. See *Broadrick* v. *Oklahoma,* 413 U. S. 601, 611–615 (1973). Appellees do not claim to be asserting the constitutional rights of others; rather, they claim that California denies them the equal protection of the laws because the restriction is so overinclusive that it destroys the State's asserted justification.

of the more than 70 positions included within the statutory classification of "peace officer," some undefined number of them "cannot be considered members of the political community no matter how liberally that category is viewed." *Id.*, at 987. The District Court's entire argument on this point consisted of just one sentence: "There appears to be no justification whatever for excluding aliens, even those who have applied for citizenship, from holding public employment as cemetery sextons, furniture and bedding inspectors, livestock identification inspectors, and toll service employees." *Id.*, at 986. In believing this sufficient, the District Court applied a standard of review far stricter than that approved in *Sugarman* and later cases.

We need not hold that the District Court was wrong in concluding that citizenship may not be required of toll-service employees, cemetery sextons, and inspectors to hold that the District Court was wrong in striking down the statute on its face.[9] The District Court assumed that if the statute was overinclusive at all, it could not stand. This is not the proper standard. Rather, the inquiry is whether the restriction reaches so far and is so broad and haphazard as to belie the State's claim that it is only attempting to ensure that an important function of government be in the hands of those having the "fundamental legal bond of citizenship." *Ambach* v. *Norwick*, 441 U. S., at 75. Under this standard, the classifications used need not be precise; there need only be a substantial fit. Our examination of the California scheme convinces us that it is sufficiently tailored to withstand a facial challenge.

The general requirements, including citizenship, for all California peace officers are found in Cal. Gov't Code Ann.

---

[9] It is worth noting, however, that of the categories mentioned by the District Court, toll-service employees, inspectors of the Bureau of Livestock, and cemetery sextons were all eliminated from coverage by amendments to Cal. Penal Code Ann. § 830.4 (West Supp. 1981), passed in 1980. 1980 Cal. Stats., ch. 1340, p. 4724, § 12, effective Sept. 30, 1980.

§ 1031 (West 1980). That section, however, does not designate any particular official as a peace officer; rather, Cal. Penal Code Ann. § 830 (West Supp. 1981) lists the specific occupations that fall within the general category of "peace officer." Even a casual reading of the Penal Code makes clear that the unifying character of all categories of peace officers is their law enforcement function. Specific categories are defined by either their geographical jurisdiction or the specific substantive laws they have the responsibility to enforce. Thus, not surprisingly, the first categories listed include police officers at the county, city, and district levels. § 830.1. This is followed by various categories of police power authorized by the State: e. g., highway patrol officers, the state police, and members of the California National Guard when ordered into active service. § 830.2. After this, the statute includes a long list of particular officers with responsibility for enforcement of different substantive areas of the law: e. g., individuals charged with enforcement of the alcoholic beverage laws, the food and drug laws, fire laws, and the horse racing laws. § 830.3. Finally, there are several catchall provisions that include some officers with narrow geographic responsibilities—e. g., park rangers, San Francisco Bay Area Rapid Transit District police, harbor police, community college police, security officers of municipal utility districts, and security officers employed in government buildings—and some with narrow "clientele"—e. g., welfare-fraud or child-support investigators, correctional officers, parole and probation officers. §§ 830.31–830.6.

Although some of these categories may have only a tenuous connection to traditional police functions of law enforcement, the questionable classifications are comparatively few in number.[10] The general law enforcement character of all

---

[10] The dissent specifically questions only four positions. *Post*, at 455, n. 7. Three of these—Dental Board Inspectors, Parks and Recreation Department employees, and voluntary fire wardens—are designated "peace officers" only when their "primary duty" is law enforcement. See Cal. Penal Code Ann. §§ 830.3(b), (c), (j) (West Supp. 1980).

California "peace officers" is underscored by the fact that all have the power to make arrests, § 836, and all receive a course of training in the exercise of their respective arrest powers and in the use of firearms. § 832. *Foley* made clear that a State may limit the exercise of the sovereign's coercive police powers over the members of the community to citizens. The California statutes at issue here are an attempt to do just that. They are sufficiently tailored in light of that aim to pass the lower level of scrutiny we articulated as the appropriate equal protection standard for such an exercise of sovereign power in *Sugarman*.[11]

## IV

The District Court also held that the citizenship requirement was invalid as applied to the positions at issue here— deputy probation officers. In reaching this conclusion, it focused too narrowly on a comparison of the characteristics and functions of probation officers with those of the state troopers at issue in *Foley* and the teachers in *Ambach*. *Foley* and *Ambach* did not describe the outer limits of permissible citizenship requirements. For example, although both of those cases emphasized the communitywide responsibilities of teachers and police, there was no suggestion that judges, who deal only with a narrow subclass of the community, cannot be subject to a citizenship requirement. See *Sugarman*, 413 U. S., at 647. Similarly, although both *Foley* and *Ambach* emphasized the unsupervised discretion that must be exercised by the teacher and the police officer in the performance of their duties, neither case suggested that jurors, who act under a very specific set of instructions, could not be required to be citizens. See *Perkins* v. *Smith*, 370 F. Supp.

---

[11] The dissent accuses the Court of holding that the law enforcement character of some of the covered positions justifies application of the citizenship restriction to unrelated positions. *Post*, at 455. We indicate no opinion as to whether noncitizen applicants for other positions could successfully challenge the statute as applied to them.

134 (Md 1974), summarily aff'd, 426 U. S. 913 (1976). Definition of the important sovereign functions of the political community is necessarily the primary responsibility of the representative branches of government, subject to limited judicial review.[12]

Looking at the functions of California probation officers, we conclude that they, like the state troopers involved in *Foley*, sufficiently partake of the sovereign's power to exercise coercive force over the individual that they may be limited to citizens. Although the range of individuals over whom probation officers exercise supervisory authority is limited, the

---

[12] Appellees also argue that the statute is facially invalid because it is impermissibly underinclusive. The District Court did not consider this contention, and the only argument advanced by appellees in support of this claim is that California fails to impose a citizenship requirement upon its public school teachers. Brief for Appellees 29. At various points, the dissent also relies upon the alleged underinclusiveness of the statute.

Although there is some language in *Sugarman* indicating that such an argument is appropriate, 413 U. S., at 640, 642, and that a statutory exclusion of aliens from a particular form of public employment will be evaluated in light of the entire framework of public employment positions open and closed to aliens, clearly our subsequent cases have not adopted that position. Thus, in both *Foley* and *Ambach* only the specific governmental functions directly at issue were considered. Underinclusiveness arguments were relevant in *Sugarman* because there the classification involved—the competitive civil service—swept in a wide variety of governmental functions. Such a sweeping and apparently indiscriminate categorization raises legitimate questions of arbitrariness that are not raised when the State limits a particular and important governmental function—*e. g.*, coercive police power—to citizens. When we deal with such a specific category, underinclusiveness arguments are relevant only within the category: Are there, for example, individuals who exercise the State's coercive police power that are not required to be citizens? In this respect, the California statutory scheme is not substantially underinclusive: Cal. Penal Code Ann. § 830.7 (West Supp. 1981) lists only two categories of positions which have the power to arrest but are not "peace officers"—and therefore are not subject to the citizenship requirement—security officers at institutions of higher education and certain individuals designated by a cemetery authority.

powers of the probation officer are broad with respect to those over whom they exercise that authority.[18]  The probation officer has the power both to arrest, Cal. Penal Code Ann. §§ 830.5, 836, 1203.2 (West Supp. 1981); Cal. Civ. Proc. Code Ann. § 131.4 (West 1954); and to release those over whom he has jurisdiction.  Cal. Penal Code Ann. § 1203.1a (West Supp. 1981).  He has the power and the responsibility to supervise probationers and insure that all the conditions of probation are met and that the probationer accomplishes a successful reintegration into the community.  Cal. Penal Code Ann. § 1203.1 (West Supp. 1981).  With respect to juveniles, the probation officer has the responsibility to determine whether to release or detain offenders, Cal. Welf. & Inst. Code Ann. § 628 (West Supp. 1981), and whether to institute judicial proceedings or take other supervisory steps over the minor.  §§ 630, 653–654.  In carrying out these responsibilities the probation officer necessarily has a great deal of discretion that, just like that of the police officer and the teacher, must be exercised, in the first instance, without direct supervision:

> "Because the probation or parole officer's function is not so much to compel conformance to a strict code of behavior as to supervise a course of rehabilitation, he has been entrusted traditionally with broad discretion to judge the progress of rehabilitation in individual cases, and has

---

[18] Measuring the scope of community contacts is more difficult than it may appear.  Although the probation officer has responsibility for only a relatively small part of the community, in exercising that responsibility the probation officer necessarily comes in contact with a much broader section of the community.  His supervisory responsibilities will bring him into contact with many of those with whom those under his supervision must interact—e. g., employers, teachers, landlords, and family.  In this respect he is very much like a policeman, who exercises his coercive authority over a small class of individuals, but carries out his responsibilities through interactions with a much larger segment of the community.

been armed with the power to recommend or even to declare revocation." *Gagnon* v. *Scarpelli,* 411 U. S. 778, 784 (1973).

One need not take an overly idealistic view of the educational functions of the probation officer during this period to recognize that the probation officer acts as an extension of the judiciary's authority to set the conditions under which particular individuals will lead their lives and of the executive's authority to coerce obedience to those conditions.[14] From the perspective of the probationer, his probation officer may personify the State's sovereign powers; from the perspective of the larger community, the probation officer may symbolize the political community's control over, and thus responsibility for, those who have been found to have violated the norms of social order. From both of these perspectives, a citizenship requirement may seem an appropriate limitation on those who would exercise and, therefore, symbolize this power of the political community over those who fall within its jurisdiction.

Therefore, the judgment of the District Court is reversed, and the case is remanded for further proceedings consistent with this opinion.

*So ordered.*

JUSTICE BLACKMUN, with whom JUSTICE BRENNAN, JUSTICE MARSHALL, and JUSTICE STEVENS join, dissenting.

Appellees Jose Chavez-Salido, Pedro Luis Ybarra, and Ricardo Bohorquez are American-educated Spanish-speaking

---

[14] Thus we do not find compelling the statistics presented by *amicus* Service Employees International Union, and cited by appellees at oral argument, Tr. of Oral Arg. 40, which indicate that because of a growing caseload, the time a probation officer has to spend with any individual offender may be minimal.

lawful residents of Los Angeles County, California.[1] Seven years ago, each had a modest aspiration—to become a Los Angeles County "Deputy Probation Officer, Spanish-speaking." Each was willing to swear loyalty to the State and Federal Governments; indeed, appellee Chavez-Salido declared his intent to become a citizen. By competitive examination, two of the appellees, and possibly the third, demonstrated their fitness for the jobs they desired.[2] Appellants denied them those jobs solely because they were not citizens.

The Court today concludes that appellees' exclusion from their chosen profession is "a necessary consequence of the community's process of political self-definition." *Ante*, at 439. The Court reaches this conclusion by misstating the standard of review it has long applied to alienage classifications. It then asserts that a lawfully admitted permanent resident alien is disabled from serving as a deputy probation

---

[1] Chavez-Salido, born in Mexico, has been a permanent legal resident of this country for 26 years. He has received all his formal education in California, including a Bachelor of Arts degree in Mexican-American studies from California State College at Long Beach.

Ybarra, born in Spain, has been a permanent resident of this country since 1972. He possesses a Bachelor of Arts degree in theology from Camillas University in Spain, and a Master of Arts degree in African Studies from the University of California at Los Angeles. He is working for another Master's degree, in sociology, at California State University at Northridge.

Bohorquez, born in Colombia, has been a permanent resident of this country since 1961. He has a Bachelor of Arts degree in Latin-American studies from the University of California at Los Angeles. App. 19–23.

[2] Chavez-Salido scored 95 out of 100 on a qualifying oral examination for the Deputy Probation Officer (DPO) II, Spanish-speaking, position and 100 out of 100 on the oral examination for the DPO Trainee position, but was offered neither job solely because of his citizenship. Ybarra was denied employment after passing examinations for the DPO Trainee and DPO II positions. Bohorquez did not pass his initial oral examination for DPO II, but did not appeal his examination results after appellants told him his alienage made an appeal useless. *Id.*, at 19–24.

officer because that job "'go[es] to the heart of represent-ative government.'" *Ante*, at 440, quoting *Sugarman* v. *Dougall*, 413 U. S. 634, 647 (1973).

In my view, today's decision rewrites the Court's prece-dents, ignores history, defies common sense, and reinstates the deadening mantle of state parochialism in public employ-ment. I must dissent.

## I

The Court properly acknowledges that our decisions re-garding state discrimination against permanent resident aliens have formed a pattern. *Ante*, at 436. Since *Yick Wo* v. *Hopkins*, 118 U. S. 356 (1886), this Court has recognized and honored the right of a lawfully admitted permanent resi-dent alien to work for a living in the common occupations of the community. In *Truax* v. *Raich*, 239 U. S. 33, 41 (1915), the Court declared that right to be

> "the very essence of the personal freedom and opportu-nity that it was the purpose of the [Fourteenth] Amend-ment to secure. . . . If this could be refused solely upon the ground of race or nationality, the prohibition of the denial to any person of the equal protection of the laws would be a barren form of words."

In *Sugarman* v. *Dougall, supra*, we expressly refused to exempt public employment positions from this general rule. *Sugarman*, an 8–1 decision, struck down as facially inconsist-ent with the Equal Protection Clause a New York statute that excluded lawfully admitted aliens from all state civil service jobs offered on the basis of competitive examinations. *Sugarman* directed that permanent resident aliens may not be barred *as a class* from the common *public* occupations of the community. There, as here, the State had asserted its substantial interest in ensuring "that sovereign functions must be performed by members of the State." Brief for Ap-pellants in *Sugarman* v. *Dougall*, O. T. 1972, No. 71–1222,

p. 10. Without denying the weight of that interest, the Court concluded that, "judged in the context of the State's broad statutory framework and the justifications the State present[ed]," 413 U. S., at 640, the State's chosen means were insufficiently precise to uphold its broad exclusion of aliens from public employment.

Since *Sugarman*, the Court consistently has held that in each case where the State chooses to discriminate against permanent resident aliens, "the governmental interest claimed to justify the discrimination is to be carefully examined in order to determine whether that interest is legitimate and substantial, and inquiry must be made whether the means adopted to achieve the goal are necessary and precisely drawn." *Examining Board* v. *Flores de Otero*, 426 U. S. 572, 605 (1976). See also *Nyquist* v. *Mauclet*, 432 U. S. 1, 7 (1977); *In re Griffiths*, 413 U. S. 717, 721–722 (1973); *Graham* v. *Richardson*, 403 U. S. 365, 376 (1971). "Alienage classifications by a State that do not withstand this stringent examination cannot stand." *Nyquist* v. *Mauclet*, 432 U. S., at 7.

Applying this stringent standard here, I would hold that, on its face, Cal. Gov't Code Ann. § 1031(a) (West 1980) violates the Equal Protection Clause. Section 1031(a) makes citizenship one of six unrelated prerequisites for employment as a "public office[r] or employe[e] declared by law to be [a] peace office[r]."[3] Scattered sections of the California Code then designate a variegated collection of public employees as "peace officers," who by definition must be citizens. When appellees first sought their jobs, the "peace officer" category encompassed more than 70 public occupations, including such apparently unrelated positions as toll takers, cemetery sex-

---

[3] Section 1031(a) provides that a peace officer must be at least 18, fingerprinted, of good moral character, a high school graduate (or the equivalent thereof), physically and mentally healthy, and "a citizen of the United States."

tons, fish and game wardens, furniture and bedding inspectors, voluntary fire wardens, racetrack investigators, county coroners, State Supreme Court and Courts of Appeal bailiffs, messengers at the State Treasurer's office, and inspectors for the Board of Dental Examiners. See *Chavez-Salido* v. *Cabell*, 427 F. Supp. 158, 169–170, n. 22 (CD Cal. 1977) (listing positions). To this day, the legislature has offered no reason why such divergent classes of public jobs were gathered under the "peace officer" umbrella.[4]

The history of the statute, reviewed by the District Court, suggests the answer. Before 1961, California did not require any of its peace officers to be citizens. See 490 F. Supp. 984, 986 (CD Cal. 1980). Indeed, in 1851, California granted only sheriffs, policemen, marshals, and constables statutory "peace officer" status. *Id.*, at 986, n. 4. For more than a century, the State did not reserve even those four occupations for citizens. Over the decades, dozens of subsequent enactments added other public positions to the "peace officer" list, but none required peace officers to be citizens. *Ibid.* Some positions were added to the list for reasons totally unrelated to logic.[5]

---

[4] After this litigation began, and the District Court had twice declared § 1031(a) unconstitutional, the California Legislature twice amended sections of its Penal Code, removing some positions from the "peace officer" list and adding others. See 490 F. Supp. 984, 986–987, n. 6 (CD Cal. 1980) (listing additions to and deletions from the peace officer list). See also 1980 Cal. Stats., ch. 1340, effective Sept. 30, 1980 (same). The legislature still has never declared what criteria it uses to decide whether a particular government position deserves "peace officer" status.

[5] A judge of the California Court of Appeal once noted:

"No mystery surrounds extension of the traditional definition of peace officer to such an unrecognizable degree by the Legislature. The Legislature must respond to the interests of various groups. Correctional officers, for example, were granted the status of 'peace officers' in order that they may obtain better group insurance benefits. . . . [B]ecause peace officers appear to have enjoyed better benefits in times past, many employee groups, even tangentially associated with the role of peace officers, have

In 1961, without stating any rationale, "in one fell swoop, the legislature passed Government Code Section 1031 which applied the mandatory citizenship requirement to all of the positions on the list." *Id.*, at 986. The legislature apparently made no attempt to include on the "peace officer" list all positions for which citizenship arguably might be relevant or to exclude all positions for which it plainly would be irrelevant. Nine years after § 1031(a) was enacted, California's own Attorney General stated:

> "It is our opinion that . . . this citizenship requirement can no longer validly be imposed. . . .
>
> "[P]rior to 1961, there was no general requirement of citizenship to be a peace officer. We are aware of no change that occurred that would justify the change at that date. . . . [W]e are of the opinion that the classification is not constitutionally permitted. There does not appear to be a compelling state interest . . . to justify classifying certain peace officers as to alienage." Opinion No. 69–199, 53 Op. Cal. Atty. Gen. 63, 67–68 (1970).

After reviewing this history, the District Court sensibly concluded, not once but twice, that § 1031(a) could not survive the rigorous standard of review mandated by *Sugarman* and its progeny. See *Chavez-Salido* v. *Cabell*, 427 F. Supp., at 169–171; *Chavez-Salido* v. *Cabell*, 490 F. Supp., at 985–986. Noting that the State's own legal counsel had found the statute unsupported by a compelling state interest, the District Court concluded that the California Legislature had never made a reasoned judgment to exclude aliens from each individual "peace officer" position. *Id.*, at 985–987. The District Court then found that, like the provision struck down in *Sugarman*, § 1031(a) "is grossly overbroad and sweeps much too broadly in its proscription of alien employment." 490 F. Supp., at 987.

---

persuaded the Legislature to include them within the term 'peace officer.'" *Hetherington* v. *State Personnel Bd.*, 82 Cal. App. 3d 582, 600, 147 Cal. Rptr. 300, 311 (1978) (Reynoso, J., dissenting).

Without even a glance at § 1031(a)'s history, the Court today reverses, reasoning that the District Court improperly "applied a standard of review far stricter than that approved in *Sugarman* and later cases." *Ante*, at 442. The Court reads *Sugarman* to hold that "strict scrutiny is out of place when the restriction [on lawfully resident aliens] primarily serves a political function." *Ante*, at 439. Based on its "casual reading" of the list of "peace officer" positions from which aliens are excluded, the Court then decides that "the unifying character of all categories of peace officers is their law enforcement function." *Ante*, at 443. Conceding that § 1031(a) also bars aliens from jobs that "may have only a tenuous connection to traditional police functions of law enforcement," *ante*, at 443, the Court nevertheless declares that alienage classifications "need not be precise; there need only be a substantial fit" between the classification used and the State's asserted interest. *Ante*, at 442.

The Court's analysis fundamentally distorts *Sugarman*. That decision did not condone a looser standard for review of classifications barring aliens from "political" jobs. In both *Sugarman* and *Nyquist*, the Court recognized that a State may name its political community by exercising its "historical and constitutional powers to define the qualifications of voters or of 'elective or important nonelective' officials 'who participate directly in the formulation, execution, or review of broad public policy.'" *Nyquist* v. *Mauclet*, 432 U. S., at 11 (footnote omitted), quoting from *Sugarman*, 413 U. S., at 647. At the same time, however, the Court warned that "in seeking to achieve this substantial purpose, with discrimination against aliens, the means the State employs must be precisely drawn in light of the acknowledged purpose." *Id.*, at 643.

While the subsequent decisions in *Foley* v. *Connelie*, 435 U. S. 291 (1978), and *Ambach* v. *Norwick*, 441 U. S. 68 (1979), have explored the boundaries of a State's power to define its political community, those cases have not altered this

stringent standard of review. *Foley* tempered the declaration that a State may entrust "its most important policy responsibilities" to its citizens with the caveat that a State may not "accomplish this end with a citizenship restriction that 'sweeps indiscriminately,' . . . without regard to the differences in the positions involved." 435 U. S., at 296 and 297, n. 5, citing *Sugarman*, 413 U. S., at 643. Similarly, *Ambach* declared that judicial tolerance of citizenship requirements for essential public offices "is an exception to the general standard applicable to classifications based on alienage." 441 U. S., at 75.

Under the *Sugarman* standard, a state statute that bars aliens from political positions lying squarely within the political community nevertheless violates the Equal Protection Clause if it excludes aliens from other public jobs in an unthinking or haphazard manner. The statutes at issue here represent just such an unthinking and haphazard exercise of state power. The District Court found, and the Court does not deny, that some of the more than 70 "peace officer" positions from which aliens have been barred "cannot be considered members of the political community no matter how liberally that category is viewed." 490 F. Supp., at 987. At the same time, California has long permitted aliens to teach in public schools, to be employed on public works, and to serve in most state, city, and county employment positions— all positions arguably within the political community.[6]

---

[6] See *Purdy & Fitzpatrick* v. *State*, 71 Cal. 2d 566, 456 P. 2d 645 (1969) (invalidating citizenship requirement for employment on public works); 1970 Cal. Stats., ch. 653, p. 1277, § 1, repealing Art. 2, ch. 2, Pt. 7, Div. 2, Cal. Lab. Code Ann. § 1940 (West 1955) (former citizenship requirement for employment in any department of the State or of any county or city). See generally Comment, The California Exclusion of Permanent Resident Aliens from Appointive Public Office, 11 C. W. L. R. 117, 126–131 (1974) (listing California governmental positions from which permanent resident aliens have and have not been excluded).

Thus, exactly like the statute struck down in *Sugarman*, California's statutory exclusion of aliens is fatally overinclusive and underinclusive. It bars aliens from employment in numerous public positions where the State's proffered justification has little, if any, relevance. At the same time, it allows aliens to fill other positions that would seem naturally to fall within the State's asserted purpose. Cf. *Sugarman*, 413 U. S., at 642. "Our standard of review of statutes that treat aliens differently from citizens requires a greater degree of precision." *Ibid.*

Nor can the Court reconcile its new notion of a "substantial fit" with the stringent standard of review the Court long has applied to alienage classifications. Every time the State requires citizenship for a single "peace officer" position, it excludes permanent resident aliens from hundreds or even thousands of public jobs. The Court's novel standard of review condones a legislative classification that excludes aliens from more than 70 public occupations although citizenship cannot be even rationally required for a substantial number of them.[7] The fact that many of those positions may involve law enforcement cannot justify barring noncitizens from any of the positions that plainly do not. Today's decision thus defies the Court's earlier holdings that the States may not exclude aliens from any "harmless and useful occupation" for which citizenship cannot rationally be required. *Yick Wo* v. *Hopkins*, 118 U. S., at 374; *Truax* v. *Raich*, 239 U. S., at 41.

---

[7] The Court cannot seriously argue, for example, that the positions of Dental Board inspector, messenger in the State Treasurer's office, Parks and Recreations Department employee, and volunteer fire warden represent "important nonelective positions," see *Sugarman* v. *Dougall*, 413 U. S. 634, 647 (1973), of the type the States historically or constitutionally have reserved for their citizens. Yet even after the legislature's latest amendments, all remain "peace officer" positions from which aliens are excluded by § 1031(a).

## II

While *Sugarman* unambiguously proscribed blanket exclusion of aliens from state jobs, its dictum acknowledged a State's power to bar noncitizens as a class from a narrowly circumscribed range of important nonelective posts involving direct participation "in the formulation, execution, or review of broad public policy." 413 U. S., at 647. Under *Sugarman*'s exception, States may reserve certain public offices for their citizens if those offices "perform functions that go to the heart of representative government." *Ibid.*

As originally understood, the *Sugarman* exception was exceedingly narrow. Less demanding scrutiny was deemed appropriate only for statutes deriving from "a State's historical power to exclude aliens from participation in its democratic political institutions" or its "constitutional responsibility for the establishment and operation of its own government." *Id.*, at 648. Long before *Sugarman*, the Court warned that "the power of a state to apply its laws exclusively to its alien inhabitants as a class is confined within narrow limits," *Takahashi* v. *Fish & Game Comm'n*, 334 U. S. 410, 420 (1948). *In re Griffiths*, 413 U. S. 717 (1973), decided the same day as *Sugarman*, further emphasized the "narrowness of the *[Sugarman]* exception" by asserting that States could not reserve for their citizens every "vital public and political role." *Nyquist* v. *Mauclet*, 432 U. S., at 11, citing *In re Griffiths*, 413 U. S., at 729.

*Sugarman*'s holding made clear that a State's power to exclude resident aliens from public occupations that entail only "execution . . . of broad public policy" is limited. *Sugarman*, 413 U. S., at 647. *Foley* v. *Connelie*, 435 U. S. 291 (1978), and *Ambach* v. *Norwick*, 441 U. S. 68 (1979), then clarified that public jobs involving execution, but not formulation or review, of executive and judicial policy will meet *Sugarman*'s exception if they constitute "one of the basic

functions of government" and "fulfil[l] a most fundamental obligation of government to its constituency." *Foley*, 435 U. S., at 297.

Even accepting the judgments in *Foley* and *Ambach* as binding, I cannot embrace the Court's unsupported assertion that "*Foley* and *Ambach* did not describe the outer limits of permissible citizenship requirements." *Ante*, at 444. From the Court's analysis in *Foley* and *Ambach*, one must conclude that a State may not invoke *Sugarman*'s narrow exception without making a substantial showing.[8]

I read *Foley* and *Ambach* to require the State to show that it has historically reserved a particular executive position for its citizens as a matter of its "constitutional prerogativ[e]." *Sugarman*, 413 U. S., at 648. Furthermore, the State must demonstrate that the public employee in that position exercises plenary coercive authority and control over a substantial portion of the citizen population. The public employee must exercise this authority over his clientele without intervening judicial or executive supervision. Even then, the State must prove that citizenship "'bears some rational relationship to the special demands of the particular position.'" *Id.*, at 647, quoting *Dougall* v. *Sugarman*, 339 F. Supp. 906, 911 (SDNY 1971) (Lumbard, J., concurring).

---

[8] In *Foley* v. *Connelie*, the Court held that the State may require policemen to be citizens because they are "clothed with" what are described as "plenary discretionary powers." 435 U. S., at 297–298. Policemen exercise those powers "over people generally" as part of their "pervasive" presence in modern society. *Id.*, at 297–299. Because policemen often act "without prior judicial authority," they require a grant of "prophylactic authority" from the State. *Id.*, at 298. Exercise of that authority demands a "very high degree of judgment and discretion, the abuse or misuse of which can have serious impact on individuals." *Ibid.*

*Ambach* v. *Norwick* held that a State may bar aliens who have not declared their intent to become citizens from teaching in public schools because teachers perform a similarly significant "governmental function." Schoolteachers, *Ambach* noted, possess a high "degree of responsibility

Without such a rigorous test, *Sugarman's* exception swallows *Sugarman's* rule. Yet the Court does not apply such a rigorous test today. Instead, it "look[s] to the importance of the [governmental] function as a factor giving substance to the concept of democratic self-government." *Ante*, at 441, n. 7. Applying this nebulous standard, the Court then concludes that Los Angeles County probation officers perform three "important sovereign functions of the political community." *Ante*, at 445. Yet on inspection, not one of those functions justifies excluding all permanent resident aliens from the deputy probation officer position.

First, the Court declares that probation officers "partake of the sovereign's power to exercise coercive force over the individual." *Ibid.* Yet the Court concedes that "the range of individuals over whom probation officers exercise supervisory authority is limited." *Ibid.* Even over those individuals, a probation officer's coercive powers are carefully conditioned by statute. Probation officers cannot carry guns. See 490 F. Supp., at 985, n. 2. They may arrest only those probationers under their jurisdiction, and even then only for the purpose of bringing them before the court for a determination whether they should be held or released. Cal. Penal Code Ann. § 1203.2 (West Supp. 1981). State statutes authorize probation officers to detain juveniles only in emergencies and, even then, for only brief periods. Cal. Welf. & Inst. Code Ann. §§ 309, 313, 315 (West Supp. 1981).

The Court claims that § 1031(a) "limit[s] the exercise of the sovereign's coercive police powers over the members of the community to citizens." *Ante*, at 444. Yet other statutes

---

and discretion" which they exercise to fulfill the government's basic obligation to provide public education. 441 U. S., at 75. Furthermore, teachers have "direct, day-to-day contact" with their students, exercise unsupervised discretion over them, act as role models, and influence their students' attitudes about the government and the political process. *Id.*, at 78–79.

belie that assertion. The State gives the power of arrest to a number of public employees who are not peace officers, but does not require that those employees be citizens. See Cal. Penal Code Ann. § 830.7 (West Supp. 1981) (describing "[p]ersons not peace officers but having powers of arrest"). Moreover, California authorizes any "private person," *including permanent resident aliens*, to arrest others who have actually committed felonies or who have committed or attempted public offenses in their presence. §§ 834, 837. The Court's hollow assertion that the legislature has reserved its sovereign coercive powers for its citizens ignores the reality that the State has already bestowed some of those powers on all private persons, including aliens.

Second, the Court asserts that probation officers necessarily have "discretion that . . . must be exercised, in the first instance, without direct supervision." *Ante*, at 446. Yet to say this is to say very little. Almost everyone who works in the government bureaucracy exercises *some* discretion that is unsupervised in the first instance. The Court itself observes that probation officers have discretion primarily to investigate, to supervise, to evaluate, and to recommend. *Ante*, at 446–447. Their primary duties are preparing presentence reports, supervising probationers, and recommending sentences and probationary terms. *Chavez-Salido* v. *Cabell*, 427 F. Supp., at 171.

While I do not denigrate these functions, neither can I equate them with the discretionary duties of policemen, judges, and jurors. Unlike policemen, probation officers are not "clothed with authority to exercise an almost infinite variety of discretionary powers." *Foley* v. *Connelie*, 435 U. S., at 297.[9] Unlike jurors who deliver final verdicts and

---

[9] Nor can the Court argue by analogy to *Ambach* v. *Norwick*, 441 U. S. 68 (1979), that probation officers, like teachers, influence their probationers' "attitudes . . . toward government, the political process, and a citizen's

judges who impose final sentences, the decisions of probation officers are always advisory to and supervised by judicial officers. California probation officers cannot by themselves declare revocation of probation. Cal. Penal Code Ann. § 1203.2 (West Supp. 1981). Furthermore, the investigative and reporting duties of a probation officer are extensively regulated by statute. §§ 1203.2–1203.12. The fact that probation officers play an integral role in the criminal justice system does not separate them from prison guards, bailiffs, court clerks, and the myriad other functionaries who execute a State's judicial policy.

More significantly, California's inflexible exclusion of aliens from deputy probation officer positions is inconsistent with its tolerance of aliens in other roles integral to the criminal justice system. California counties apparently may appoint aliens to the positions of *chief* juvenile probation officer or *chief* adult probation officer "if . . . the best interests of the county will be served." Cal. Gov't Code Ann. § 24001 (West Supp. 1981). Furthermore, even before *In re Griffiths*, 413 U. S. 717 (1973), the California Supreme Court had held that lawfully resident aliens may not be barred constitutionally from the practice of law. *Raffaelli* v. *Committee of Bar Examiners*, 7 Cal. 3d 288, 496 P. 2d 1264 (1972). Nor are resident aliens barred from becoming California Superior Court judges or Supreme Court justices.[10]

---

social responsibilities." *Id.*, at 79. Such an assertion would ignore the reality of a modern probation officer's life.

In 1973, the average federal probation officer supervised nearly 100 offenders. Federal Judicial Center, Probation Time Study 3 (Feb. 26, 1973). Each offender under supervision was accorded between six and eight hours of supervision from his probation officer in a year, or seven to nine minutes per week. *Ibid.* It blinks reality to suggest that a probation officer subject to these pressures has either the time or the inclination to give his probationers lessons in civics.

[10] Until 1966, Cal. Gov't Code Ann. §§ 69500, 68804 required that Superior Court judges and Supreme Court justices be citizens. In 1967, however, those provisions were repealed. 1967 Cal. Stats., ch. 17, pp. 841,

Thus, a criminal defendant in California may be represented at trial and on appeal by an alien attorney, have his case tried before an alien judge and appealed to an alien justice, and then have his probation supervised by a county probation department headed by an alien. I find constitutionally absurd the Court's suggestion that the same defendant cannot be entrusted to the supervised discretion of a resident alien deputy probation officer. In the Court's own words, a statutory scheme that tolerates such a result is sufficiently "haphazard as to belie the State's claim that it is only attempting to ensure that an important function of government be in the hands of those having the 'fundamental legal bond of citizenship.'" *Ante*, at 442.

The Court's third and final claim is that a probation officer acts as an actual and symbolic "extension" of the judiciary's authority to set conditions of probation and the executive's authority to coerce obedience to those conditions. *Ante*, at 447. Yet, by so saying, the Court simply concedes that the ultimate authority for a probation officer's acts lies elsewhere. In *Griffiths*, we held that aliens are not constitutionally disabled from serving as "officers of the court." 413 U. S., at 722–727. Given the size of the State's judicial and executive bureaucracy, little would be left of *Sugarman*'s holding if a State could invoke the *Sugarman* exception to exclude probation officers from any position which "extended" judicial or executive authority.[11]

Nor am I convinced by the Court's claim that a probation officer personifies the State's sovereign powers in the eyes of

845, §§ 61, 87. As a result, the only remaining restriction on becoming a judge in California is membership in the state bar for a certain number of years. Cal. Const., Art. VI, § 15. After the California Supreme Court's decision in *Raffaelli*, aliens became eligible for the bar and, hence, to become judges.

[11] The Court concedes as much when it notes that "almost every governmental official can be understood as participating in the execution of broad public policies." *Ante*, at 441, n. 7.

probationers and the larger community. This justification knows no limit. Surely a taxpayer feels the State's sovereign power when the local tax collector comes to his door; the larger community recognizes the sovereign power of the government when local firefighters put out a fire. The State could not also demand citizenship for those jobs, however, without thoroughly eviscerating *Sugarman.* Nor does the Court deny that the sight of foreign-born individuals not merely following, but encouraging others to follow, our laws is an equally powerful symbol of respect for our society's social norms.

In the end, the State has identified no characteristic of permanent resident aliens *as a class* which disables them from performing the job of deputy probation officer. Cf. *Foley* v. *Connelie,* 435 U. S., at 308 (STEVENS, J., dissenting). The State does not dispute that these appellees possess the qualifications and educational background to perform the duties that job entails. See nn. 1 and 2, *supra.* Indeed, the State advances no rational reason why these appellees, native Spanish-speakers with graduate academic degrees, are not superbly qualified to act as probation officers for Spanish-speaking probationers, some of whom themselves may not be citizens. Cf. *Ambach* v. *Norwick,* 441 U. S., at 84, 87–88 (dissenting opinion).

The State cannot challenge the appellees' lack of familiarity with local laws or rules. Such a consideration might disqualify nonresident citizens, but not permanent resident aliens who have lived in California for much of their lives. Nor can the State presume that aliens as a class would be less loyal to the State. The Court's rulings in *In re Griffiths,* 413 U. S., at 726, n. 18, and *Hampton* v. *Mow Sun Wong,* 426 U. S. 88, 111, n. 43 (1976), clearly state that one need not be a citizen in order to swear in good conscience to support the Constitution. When these appellees applied for their jobs, they expressed their willingness to take such oaths. One later declared his intent to become, and then became, a citizen. See

490 F.Supp., at 985, n. 2. Finally, the State cannot claim that by enacting § 1031(a), it seeks to encourage aliens to become citizens. That objective is an exclusively federal interest. *Nyquist* v. *Mauclet*, 432 U. S., at 10–11.

I only can conclude that California's exclusion of these appellees from the position of deputy probation officer stems solely from state parochialism and hostility toward foreigners who have come to this country lawfully. I find it ironic that the Court invokes the principle of democratic self-government to exclude from the law enforcement process individuals who have not only resided here lawfully, but who now desire merely to help the State enforce its laws. Section 1031(a) violates appellees' rights to equal treatment and an individualized determination of fitness.

I would affirm the District Court's ruling that § 1031(a) is unconstitutional on its face and as applied.