Dear Chairwoman Patricia Linville
¶ 0 This office has received your request for an official Attorney General Opinion in which you ask, in effect, the following question:
 Does 59 O.S. 2001, § 1458[59-1458] of the Polygraph Examiners Act, which requires applicants to be United States citizens before granting internship or licensure, violate the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States?
¶ 1 Title 59, Section 1458(A) of the Polygraph Examiners Act provides:
 The following shall be considered as minimum evidence satisfactory to the Board that the applicant is qualified for registration as a polygraph examiner:
 1. Attainment of at least twenty-one (21) years of age;
2. Citizenship of the United States;
 3. Be a person of honesty, truthfulness, integrity, and moral fitness;
 4. Never have been convicted of a felony or a misdemeanor involving moral turpitude; and
 5. a. hold a baccalaureate degree from a college or university accredited by the American Association of Collegiate Registrars and Admissions Officers, or, in lieu thereof, be a graduate of an accredited high school and have five (5) consecutive years of active investigative experience of a character satisfactory to the Board,
 b. be a graduate of a polygraph examiners course approved by the Board and have satisfactorily completed not less than six (6) months of internship training, and
 c. have passed an examination conducted by and to the satisfaction of the Board, or under its supervision, to determine his competency to obtain a license to practice as an examiner.
Id. (emphasis added). You ask if it is permissible under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution to require United States citizenship as a minimum qualification for licensure under the Polygraph Examiners Act.
¶ 2 The United States Supreme Court, in striking down a Connecticut court rule requiring United States citizenship for applicants for admission to the state bar, noted the "wide-ranging restrictions [that] began to impair significantly the efforts of aliens to earn a livelihood in their chosen occupations." In re Griffiths, 413 U.S. 717, 719 (1973). The Court held that strict scrutiny applied to attempts by a state to limit occupational licensing to U.S. citizens. The Court reasoned that because "[r]esident aliens, like citizens, pay taxes, support the economy, serve in the Armed Forces, and contribute in myriad other ways to our society[; i]t is appropriate that a State bear a heavy burden when it deprives them of employment opportunities." Id. at 722. In explaining the holding, Justice Powell quoted Truax v. Raich, 239 U.S. 33, 41 (1915), which held that:
 It requires no argument to show that the right to work for a living in the common occupations of the community is of the very essence of the personal freedom and opportunity that it was the purpose of the (Fourteenth) Amendment to secure. . . . If this could be refused solely upon the ground of race or nationality, the prohibition of the denial to any person of the equal protection of the laws would be a barren form of words.
Id. at 720. See also Sugarman v. Dougall, 413 U.S. 634,646 (1973) (striking down as unconstitutional a New York civil service law provision permitting only citizens to hold permanent positions in the competitive class of the state civil service);Examining Bd. of Eng'rs v. Flores de Otero, 426 U.S. 572, 606
(1976) (striking down a Puerto Rico law requiring citizenship for a civil engineering license); Bernal v. Fainter,467 U.S. 216, 228 (1984) (striking down a Texas law requiring citizenship for notaries public).
¶ 3 The United States Supreme Court recognized a narrow exception to the rule that excluding aliens from certain occupations triggers strict scrutiny. See Bernal,467 U.S. at 220. "This exception has been labeled the `political function' exception and applies to laws that exclude aliens from positions intimately related to the process of democratic self-government."Id. Bernal explained the rationale behind the political function exception:
 [W]ithin broad boundaries a State may establish its own form of government and limit the right to govern to those who are full-fledged members of the political community. Some public positions are so closely bound up with the formulation and implementation of self-government that the State is permitted to exclude from those positions persons outside the political community, hence persons who have not become part of the process of democratic self-determination.
Id. at 221 (citing Cabell v. Chavez-Salido, 454 U.S. 432,439-40 (1982)). Cabell emphasized the exception applied "only to `persons holding state elective or important nonelective executive, legislative, and judicial positions,' those officers who `participate directly in the formulation, execution, or review of broad public policy' and hence `perform functions that go to the heart of representative government.'" Cabell,454 U.S. at 440 (quoting Sugarman v. Dougall, 413 U.S.634, 647 (1973)).
¶ 4 The United States Supreme Court also held the political function exception applies to law enforcement officers and teachers. See Foley v. Connelie, 435 U.S. 291, 297 (1978) ("The police function fulfills a most fundamental obligation of government to its constituency[,]" and law enforcement officers "are clothed with authority to exercise an almost infinite variety of discretionary powers."); Cabell, 454 U.S. at 445
(holding that probation officers "sufficiently partake of the sovereign's power to exercise coercive force over the individual that they may be limited to citizens"); Ambach v. Norwick,441 U.S. 68, 76-77 (1979) (holding teachers perform yet another "fundamental obligation of government to its constituency," including "inculcating fundamental values necessary to the maintenance of a democratic political system").
¶ 5 It may be argued that the political function exception applies to polygraph examiners because of the importance of the profession, and its expertise in detecting deception to the state function of law enforcement. See, e.g., 59 O.S. 2001, §1458[59-1458](B) (noting employment of polygraph examiners by the Oklahoma State Bureau of Investigation); Harris v. State,841 P.2d 597, 602 (Okla.Crim. 1992) (noting that "[t]he value and usefulness of the polygraph examination as an instrument of investigation, albeit excluding the test results from admission at trial, has been recognized by this Court."). However, it is doubtful that such an argument would be sustained. Bernal
emphasized "that the political-function exception must be narrowly construed; otherwise the exception will swallow the rule and depreciate the significance that should attach to the designation of a group as a `discrete and insular' minority for whom heightened judicial solicitude is appropriate." Bernal,467 U.S. at 222 n. 7.
¶ 6 In Bernal, Texas maintained that notaries were designated public officers by the Texas Constitution, indicating the "State views notaries as important officials occupying posts central to the State's definition of itself as a political community." Id.
at 223. The state and the Fifth Circuit Court of Appeals also argued:
 With the power to acknowledge instruments such as wills and deeds and leases and mortgages; to take out-of-court depositions; to administer oaths; and the discretion to refuse to perform any of the foregoing acts, notaries public in Texas are involved in countless matters of importance to the day-to-day functioning of state government. The Texas political community depends upon the notary public to insure that those persons executing documents are accurately identified, to refuse to certify any identification that is false or uncertain, and to insist that oaths are properly and accurately administered. Land titles and property succession depend upon the care and integrity of the notary public, as well as the familiarity of the notary with the community, to verify the authenticity of the execution of the documents.
Id. at 224-25 (quoting Vargas v. State, 710 F.2d 190, 194
(5th Cir. 1983), rev'd sub nom. Bernal v. Fainter,467 U.S. 216 (1984)).
¶ 7 The Court rejected these arguments. See Bernal,467 U.S. at 223-25. Bernal recognized the critical need for notaries to perform their offices with integrity, but held that "a notary's duties, important as they are, hardly implicate responsibilities that go to the heart of representative government." Id. at 225. The Court reasoned, "notaries do not routinely exercise the State's monopoly of legitimate coercive force. Nor do notaries routinely exercise the wide discretion typically enjoyed by public school teachers when they present materials that educate youth respecting the information and values necessary for the maintenance of a democratic political system." Id. (footnote omitted). The Court explained that "[t]o be sure, considerable damage could result from the negligent or dishonest performance of a notary's duties." Id. It noted, however, that "the same could be said for the duties performed by cashiers, building inspectors, the janitors who clean up the offices of public officials, and numerous other categories of personnel upon whom we depend for careful, honest service." Id. at 225-26.
¶ 8 The Court in Griffiths reasoned that "`a lawyer is engaged in a private profession, important though it be to our system of justice. In general he makes his own decisions, follows his own best judgment, collects his own fees and runs his own business.'" In re Griffiths, 413 U.S. at 728-29 (quotingCammer v. United States, 350 U.S. 399, 405 (1956)).Griffiths acknowledged that "[l]awyers do indeed occupy professional positions of responsibility and influence that impose on them duties correlative with their vital right of access to the courts. Moreover, by virtue of their professional aptitudes and natural interests, lawyers have been leaders in government throughout the history of our country." Id. at 729. The Court concluded, however, that "they are not officials of government by virtue of being lawyers. Nor does the status of holding a license to practice law place one so close to the core of the political process as to make him a formulator of government policy." Id.
¶ 9 Polygraph examiners may be closely connected with law enforcement, and, as with notaries, considerable damage may result from the negligent performance of their duties. Additionally, polygraph examiners, like lawyers, may be important to our system of justice. However, polygraph examiners do not routinely exercise the state's monopoly of legitimate coercive force. See, e.g., 59 O.S. 2001, § 1468[59-1468](2) (mandating that, with few exceptions, examinations are voluntary). Further, polygraph examination is regulated in Oklahoma as a profession or occupation. See 59 O.S. 2001 Supp. 2003, §§ 1451-1475. Polygraph examiners do not occupy important nonelective executive, legislative, or judicial positions whereby they participate directly in the formulation, execution, or review of broad public policy.[1] See id.
¶ 10 It is, therefore, the official Opinion of the AttorneyGeneral that:
 Title 59 O.S. 2001, § 1458(A)(2) of the Polygraph Examiners Act, which requires applicants to be United States citizens before granting internship or licensure, is unconstitutional under the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States.[2]
 W.A. DREW EDMONDSON Attorney General of Oklahoma
 JOANN T. STEVENSON Assistant Attorney General
[1] We note the Attorney General of South Carolina reached the same conclusion, holding "an individual should probably not be denied the right to be trained as a polygraph examiner solely on the basis that he is not a United States citizen." 1984 Op. Att'y Gen. ___, 1984 WL 249928, at *4 (S.C.A.G.)
[2] An Attorney General Opinion stating an act of the Legislature is unconstitutional should be considered advisory only, and is not binding until upheld by an action in district court. State ex rel. York v. Turpen, 681 P.2d 763, 767 (Okla. 1984).