Stephenson, J.
 

 These three cases were consolidated and submitted together, as the same alleged controlling questions arise in each case. There will be no further statement of fact in this opinion, other than is absolutely necessary in order to apply the law, as the court interprets it.
 

 It is assumed that the depositions in question were being taken before a regularly appointed notary public in pursuance of notice as provided by statute, as no question was raised along these lines.
 

 Stranahan was served with an ordinary subpoena, and Bevan and Koehrman were served with subpoenas
 
 duces tecum.
 

 No complaint is made as to the service of the subpoenas. It is contended that the subpoenas
 
 duces tecum
 
 “were so broad and sweeping in their terms as to be violative of due process and to constitute unreasonable searches, and seizures, in addition to calling for incompetent and immaterial evidence.”
 

 As bearing upon this particular phase of the case,
 
 it is significant
 
 that no question of privilege was raised.
 

 Stranahan and Koehrman disobeyed the order of their subpoenas and failed to appear. Bevan appeared, was sworn, answered the preliminary questions as to name and residence, refused to answer further questions, and refused to produce any of the books, records and documents described in his subpoena
 
 duces
 
 
 *134
 

 tecum,
 
 giving as Ms reason therefor that he “was acting upon the advice of counsel,” which, of itself, in a case of this character, is no reason at all. Attachments were issued and served on Stranahan and Koehrman. Brushing aside the preliminary proceedings, all three of them were arrested and committed to jail until they “should testify.” Thereupon applications were made to the Court of Appeals for their release. It would be of little moment whether the application was made under favor of Section 11514, General Code of Ohio, or whether it was in the form of
 
 habeas corpus,
 
 except that the United States Circuit Court of Appeals of the Sixth Circuit has held substantially that this statute provides a method for judicial review of the action of the notary. Bevan v.
 
 Light, Sheriff,
 
 (C. C. A.), 61 F.(2d), 1019.
 

 The Court of Appeals heard the applications of all three, dismissed their petitions and they were thereupon automatically remanded to the custody of the sheriff of Lucas county; and this court is asked, in this proceeding, to reverse the Court of Appeals and discharge plaintiffs in error from custody.
 

 Practically all the statutes empowering notaries public to take depositions and commit any one violating their lawful orders are attacked.
 

 The administration of justice would be seriously impeded had not the General Assembly made some provision for the taking of depositions. As a part of the instrumentality for taking depositions, the Legislature created the office of notary public and made it appointive. There was reason for this enactment. A notary public, above all officers, should not be under any obligation to the electorate of his county. A notary public is appointed by the Governor, on the certificate of the common pleas judge of the county for which he is appointed, which judge must have personal knowledge of his good moral character and his ability to per
 
 *135
 
 form the duties of the office, or ascertain same by an examination prescribed by the rules of court.
 

 No requirement as to fitness is required of a justice of the peace. If the individual who is a candidate for the office of justice of the peace in his township secures the greater number of votes, he is justice of the peace, regardless of fitness, and he is a judicial officer with power to “hear and determine,” and undoubtedly with power to commit for contempt of his court.
 

 Can it be said that the Legislature has no authority to delegate the power to commit to a notary public, notwithstanding his fitness, just because he has no power to “hear and determine?”
 

 Our forebears, with uncanny wisdom, gave us the legislative, executive and judicial functions of government, and intended that they should operate as “checks and balances.” During our formative period, the courts, federal and state, viewed with jealousy any attempt on the part of Congress or a state Legislature to delegate the powers inherent in one branch of government to another. Our rapid expansion made necessary the creation of many new offices and they were created, probably too many of them; but had not the courts relaxed to some extent the rule requiring the powers of government to be kept sacredly separate, we would have had many more of them.
 

 It would not be necessary to go beyond the confines of Ohio to find scores of instances wherein one branch of government has been invested with the powers of another. This departure had to be made as a matter of public exigency.
 

 A notary public is a ministerial officer, as that term has been understood so long that “the memory of man runneth not to the contrary.” Some worth-while authorities insist that the word “ministerial” means nothing, as applied to an officer — that our officers are legislative, executive and judicial. Under this strict nomenclature we must hold that a notary public is an
 
 *136
 
 executive officer, clothed with such power as the Legislature, within its constitutional limitations, saw fit to delegate to him.
 

 Is the power to commit, delegated to notaries public, a judicial function? We think not. It is so circumscribed by legislative- enactment that there is little room remaining within which to. exercise the only judicial function, if it by any stretch of the imagination could be called a judicial function, whether he will or will not commit.
 

 That is not all. We are not so sure that the section under which commitment by a notary is authorized is not a mandatory statute, notwithstanding the language used is directory.
 

 Section 11512, General Code, provides that the notary “may fine” or “may imprison” for disobedience of the order of a subpoena or for refusal to testify. While language is helpful in determining whether a statute is mandatory or directory, it is by no means conclusive. The true test is the legislative intent. What is the purpose of the statute? What did the Legislature intend that it should accomplish?
 

 The purpose of depositions is threefold: First, to obtain the testimony of witnesses beyond the jurisdiction of the court; second, to perpetuate testimony; and, third, to operate as a bill of discovery.
 

 The Legislature evidently sought to provide a means whereby a litigant’s rights would be preserved in a case the exigencies of which would prevent him from producing his testimony in court in the regular way; to compel the producton of testimony that might be forever lost; and to afford an opportunity to the litigant to secure evidence of facts necessary to make out his case, which evidence was peculiarly within the knowledge, or, if documentary, in the possession and control of his adversary.
 

 Under these enactments the litigant is entitled to these rights as a matter of law. He undertakes, to
 
 *137
 
 assert them. Notices are regularly served to take depositions of the officers of an adversary corporation. Subpoenas are regularly served. One officer appears in obedience to his subpoena, and refuses to testify. Two other officers refuse to appear. The litigant requests the notary to fine or commit the recalcitrant witnesses under such circumstances, and the notary flatly refuses to either fine or commit — must the litigant stop here and proceed anew before another notary or can he not resort to a court of record and by mandamus compel the notary to do his duty?
 

 The witness is given the right to have the assessment of his fine or his commitment inquired into by a court of competent jurisdiction. Is the door of the law closed to the litigant?
 

 We are not holding Section 11512, General Code, to be a mandatory statute, as it is not necessary so to do in this case.
 

 The plaintiff in the action in which it was sought to take these depositions was not at all modest in her demands. The subpoenas
 
 duces tecum
 
 did call for the production of a mass of testimony, but it must be remembered that this is an action alleging fraudulent conspiracy, and, from the allegations of the petition, the range of the testimony was necessarily large.
 

 The allegations of this petition are sufficient to authorize an inspection of all records, documents and correspondence of the Woolson Spice Company from the time Hermann Sielcken became connected with the corporation until his death. This would include evidence of inducement whereby he was encouraged to connect himself with the corporation, if such evidence existed, as well as evidentiary matter since his death that lent light to the alleged fraudulent transactions during his lifetime.
 

 In the absence of any question of privilege, we do not regard the scope of these subpoenas as unreason
 
 *138
 
 ably comprehensive, or that they constitute unlawful search and seizure.
 

 Clara Sielcken Schwarz as widow and sole residuary legatee of Hermann Sielcken, deceased, upon the rer fusal of his personal representative to institute the action, had full right and capacity to file and maintain the action brought by her. To hold otherwise would be to place heirs, legatees and devisees at the mercy of capricious administrators, executors and trustees. On this proposition we are content with the authorities cited by the learned Court of Appeals which heard the case:
 
 24
 
 Corpus Juris, 797, Section 1981; 11 Ruling Case Law, 262, Section 297; 22 L. R. A. (N. S.), 458, note; and 20 Ann. Cas., 96.
 

 Whether the petition is demurrable, or the action is barred by the statute of limitations, or Clara Sielcken Schwarz should not prevail in her suit because of laches, furnish no plausible pretext, and certainly no defense to Bevan, Koehrman and Stranahan for the disobedience of the orders of their subpoenas, in the face of Section 11526, General Code, which provides, in substance, that depositions may be taken at any time after the service of summons.
 

 The right to examine these relators, either orally or by deposition, as upon cross-examination, is statutory, and its exercise does not necessarily constitute a “fishing expedition.” Neither of these sections is in contravention of the federal or state Constitutions.
 

 The fact that all parties defendant were not served with summons when their depositions were sought to be taken can make no difference so far as the relators are concerned, if they have been so served.
 

 The contention that the notary who committed the relators was disqualified because of interest is not tenable, and does not come within the purview of
 
 Tumey
 
 v.
 
 Ohio,
 
 273 U. S., 510, 47 S. Ct., 437, 71 L. Ed., 749, 50 A. L. R., 1243.
 

 The review of the action of the notary in committing
 
 *139
 
 relators as provided by Section 11514, General Code, afforded them dne process. In addition, the right and opportunity to object to any and all testimony taken by the notary, as being irrelevant, incompetent, or privileged, was preserved to them in the trial court, and they had due process of law.
 

 It has been heretofore held by this court that a notary public, in committing a witness to jail for refusing to answer questions, and in issuing an attachment for a witness who disobeys the order of his subpoena, does not exercise judicial power, and we see no good reason why we should depart from this long-established rule:
 
 De Camp
 
 v.
 
 Archibald,
 
 50 Ohio St., 618, 35 N. E., 1056, 40 Am. St. Rep., 692;
 
 Benckenstein
 
 v.
 
 Schott, Sheriff,
 
 92 Ohio St., 29, 110 N. E., 633.
 

 These cases are likewise sufficient answer to the claim that Sections 11510, 11511 and 11512, General Code, are violative of the state and federal constitutions in denying due process of law.
 

 We find no prejudicial error in the record of any of these cases, and the judgment of the Court of Appeals in each and all of them is affirmed.
 

 Judgments affirmed.
 

 Day, Aihen, Jones and Matthias, JJ., concur.
 

 Weygandt, C. J., and Kinkade, J., not participating.