**Margarita M. VARGAS and Efrem Bernal, etc., Plaintiffs-Appellees,**

v.

**George W. STRAKE, Jr., etc., et al. Defendants-Appellants.**

**No. 81-2457.**

United States Court of Appeals, Fifth Circuit.

July 25, 1983.

---

Martha H. Allan, Asst. Atty. Gen., John W. Fainter, First Asst. Atty. Gen., Richard E. Gray, Executive Asst. Atty. Gen., Paul R. Gavia, Asst. Atty. Gen., Austin, Tex., for Strake.

Theodore C. Hake, Edinburg, Tex., for Saldana.

Roy S. Dale, Brownsville, Tex., for Rivera.

Carinhas & Morrow, Thomas Sullivan, Brownsville, Tex., for plaintiffs-appellees.

Before INGRAHAM, REAVLEY and POLITZ, Circuit Judges.

REAVLEY, Circuit Judge:

This case is an appeal from a district court judgment declaring unconstitutional Tex.Rev.Civ.Stat.Ann. art. 5949(2) (Supp. 1982), which requires a person to be a United States citizen in order to be eligible for appointment as a notary public in the State of Texas. We reverse.

Factual and Procedural Background

This action challenging the constitutionality of art. 5949(2) was originally brought by Margarita M. Vargas who, at the time of filing, was a citizen of the Republic of Mexico but a resident alien of the United States, lawfully registered with the Immigration & Naturalization Service and living in Texas. Vargas completed much of her education in this country, including college; she has been employed as a legal secretary and is presently the secretary/receptionist for a real estate firm in Brownsville. After she began the suit, she obtained United States citizenship.

A second party, Efrem Bernal, was later added as an individual plaintiff. Bernal has at all times been and still is a citizen of the Republic of Mexico, but he, too, has been a lawful resident alien in this country for some years now. Bernal has been employed for several years as a paralegal assistant by Texas Rural Legal Aid, Inc. Prior to that, he was employed by AMOS, Inc., a migrant legal services program in Plymouth, Indiana. From 1974 to 1978 Bernal served as a notary public for Marshall County, Indiana.

The defendants/appellants in this action are the Texas Secretary of State and the county clerks of Cameron and Hidalgo counties. The county clerks uniformly require all applicants for the position of notary public to complete a standardized application form, which is then forwarded to the Secretary of State for consideration.

In 1979 Vargas applied to become a notary public in Texas; at that time she was still a citizen of Mexico but lawfully residing within Texas. Pursuant to established procedures, her application was received by the Texas Secretary of State. The record reveals that whenever that office receives applications from noncitizens, it either sets an administrative hearing or, if the applicant is also applying for citizenship, holds the application in abeyance pending final action of federal authorities on the application for citizenship. In Vargas' case the latter route was followed.

In 1978 Bernal had also applied to become a notary public in Texas. The Secretary of State denied his application. Bernal appealed that decision, obtaining a state administrative hearing, but the result of the hearing was that the Secretary's decision was upheld.

In the present action, Vargas and Bernal sought a declaratory judgment pursuant to 28 U.S.C. §§ 2201, 2202 that art. 5949(2) was unconstitutional because it violated the equal protection clause of the Fourteenth Amendment, insofar as it denied a lawful resident alien the opportunity to attain appointment as a notary public in Texas. No contention was made that the Texas law was an economic disadvantage to the plaintiffs. Both Vargas and Bernal admitted that neither were threatened with loss of employment or pay because they were not notaries.

Applying a strict scrutiny standard, the court held that the statute was unconstitutional as violative of the equal protection

clause. The court further held that the citizenship requirement could not be upheld even under the less stringent rational relationship test. It therefore granted declaratory relief and permanently enjoined the defendants from refusing to consider Vargas and Bernal for appointment as notaries public in Texas on the ground of their citizenship status.

The defendants have brought the present appeal, raising four issues: (1) whether the action is moot as to Vargas, because she is now a United States citizen (and because only the declaratory judgment/injunctive relief portion of the district court's order is in issue); (2) whether the court erred in holding that plaintiff Bernal was not required to exhaust administrative remedies (by appealing the denial of his application by the administrative tribunal into the Texas state court system); (3) whether the district court applied an incorrect legal standard in judging the constitutionality of the statute in question (and the connected issue of the constitutionality of the statute under the appropriate standard); and (4) whether Vargas and Bernal were entitled to an award of costs and attorneys' fees.

■ Although the issues herein appear to have become moot as to Vargas (because she can reapply for a commission as a notary public having now attained citizenship), they are clearly not moot as to Bernal (nor do the defendants argue that they are). Moreover, Bernal was clearly not required to appeal into the state court system the denial of his application by the administrative tribunal as a prerequisite to challenging the constitutionality of the statute in federal court. *See Public Utilities Commission v. United States,* 355 U.S. 534, 539–40, 78 S.Ct. 446, 450–51, 2 L.Ed.2d 470 (1958).

We turn to the heart of this controversy—the constitutionality of art. 5949(2).

### Constitutionality of the Citizenship Requirement in art. 5949(2)

Noting that classifications based on alienage have generally been subjected to close judicial scrutiny,[1] the district court applied a "strict scrutiny" standard in judging the constitutionality of art. 5949(2) and struck down the statute because it could find no compelling state interest to uphold it. The court alternatively held that even if the constitutionality of the statute were considered under the less stringent "rational relationship" test,[2] it was unconstitutional because the "functions performed by notaries public, while aiding in the smooth operation of a multitude of day-to-day affairs, are for the most part ministerial, lacking the close relationship with governmental policymaking and discretionary concerns .... [t]he citizenship requirement in this case is wholly unrelated to the achievement of any valid state interest."

The latest word from the Supreme Court addressing the sensitive topic of state classifications dealing with aliens may be found in *Cabell v. Chavez-Salido,* 454 U.S. 432, 102 S.Ct. 735, 70 L.Ed.2d 677 (1982). The district court did not have the benefit of the Court's analysis in *Cabell,* as that decision was handed down by the Supreme Court subsequent to the decision here. With the advantage of the *Cabell* decision we conclude that the constitutionality of art. 5949(2) must be judged under a rational relationship test and, further, that when so judged, the constitutionality of the statute must be upheld.

---

**1.** *See Graham v. Richardson,* 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971) (recognizing that classifications based on alienage are "inherently suspect" and holding unconstitutional as violative of equal protection clause state statutes denying welfare benefits to resident aliens or to aliens who have not resided in the United States for a specified number of years).

**2.** *See Ambach v. Norwick,* 441 U.S. 68, 99 S.Ct. 1589, 60 L.Ed.2d 49 (1979) (holding that public schoolteachers come within "governmental function" principle such that federal constitution requires only that a citizenship requirement applicable to teaching in public schools bears a rational relationship to a legitimate state interest); *Foley v. Connelie,* 435 U.S. 291, 98 S.Ct. 1067, 55 L.Ed.2d 287 (1978) (applying a rational-basis standard and holding that state could exclude aliens from becoming state troopers).

In *Cabell* the Court attempted to summarize the precise contours of its previous holdings in the area of state classifications affecting aliens. In that case resident aliens were refused employment by a California county as deputy probation officers. They filed suit in federal court seeking a judgment declaring unconstitutional a California statute which required a person to be a United States citizen in order to be a peace officer or to occupy any state, county or local governmental position declared by state law to possess powers of a peace officer. A three-judge district court panel declared the California statute unconstitutional, but the Court, by a five to four vote, reversed.

██ Writing the majority opinion, Justice White recognized that under the Court's holdings in *Sugarman v. Dougall,* 413 U.S. 634, 93 S.Ct. 2842, 37 L.Ed.2d 853 (1973) and other cases, "citizenship is not a relevant ground for the distribution of economic benefits, [but] it is a relevant ground for determining membership in the political community." 454 U.S. at 438, 102 S.Ct. at 739. State restrictions that affect lawfully resident aliens primarily in an economic fashion will be subject to heightened or strict judicial scrutiny. *Id.*[3] Conversely, strict scrutiny will not be applied when the restriction serves primarily a political function:

> "[O]ur scrutiny will not be so demanding where we deal with matters resting firmly within a State's constitutional prerogatives [and] constitutional responsibility for the establishment and operation of its own government, as well as the qualifications of an appropriately designated class of public office holders." *Sugarman v. Dougall, supra,* 413 U.S., at 648, 93 S.Ct., at 2850. We have thus "not abandoned the general principle that some state functions are so bound up with the opera-

tion of the State as a governmental entity as to permit the exclusion from those functions of all persons who have not become part of the process of self government." *Ambach v. Norwick,* 441 U.S. 68, 73–74, 99 S.Ct. 1589, 1593, 60 L.Ed.2d 49 (1979). And in those areas the state's exclusion of aliens need not "clear the high hurdle of 'strict scrutiny,' because [that] would 'obliterate all the distinctions between citizens and aliens, and thus depreciate the historic value of citizenship.'" *Foley v. Connelie,* 435 U.S. 291, 295, 98 S.Ct. 1067, 1070, 55 L.Ed.2d 287 (1978) (citations omitted).

*Id.* (footnote omitted).

The *Cabell* Court also explained that the *Sugarman* decision should be regarded as establishing a two-step process for determining whether a particular state restriction on legally resident aliens serves political versus economic goals:

> First, the specificity of the classification will be examined: a classification that is substantially over or underinclusive tends to undercut the governmental claim that the classification serves legitimate political ends. The classification in *Sugarman* itself—all members of the competitive civil service—could not support the claim that it was an element in "the State's broad power to define its political community," 413 U.S., at 643, 93 S.Ct., at 2848, because it indiscriminately swept in menial occupations, while leaving out some of the state's most important political functions. Second, even if the classification is sufficiently tailored, it may be applied in the particular case only to "persons holding state elective or important nonelective executive, legislative, and judicial positions," those officers who "participate directly in the formulation, operation, or review of broad public policy" and hence "perform functions that go

**3.** *See Examining Board v. Flores de Otero,* 426 U.S. 572, 604, 96 S.Ct. 2264, 2282, 49 L.Ed.2d 65 (1976) (Court struck down Puerto Rican law that would have denied license as a civil engineer to resident alien, noting that the right to work for a living in the common occupations of the community " 'is of the very essence of the personal freedom and opportunity that it was the purpose of the [Fourteenth] Amendment to secure' "); *In re Griffiths,* 413 U.S. 717, 93 S.Ct. 2851, 37 L.Ed.2d 910 (1973) (Court struck down Connecticut law restricting admission to the bar to United States citizens as violative of equal protection rights of resident aliens).

to the heart of representative government". *Id.,* at 647, 93 S.Ct., at 2850. We must therefore inquire whether the "position in question ... involves discretionary decisionmaking, or execution of policy, which substantially affects members of the political community." *Foley v. Connelie, supra,* 435 U.S., at 296, 98 S.Ct., at 1070.

454 U.S. at 440, 102 S.Ct. at 740 (footnote omitted). Thus, our inquiry in the present case should be whether the citizenship restriction imposed by Texas on the position of notary public serves political or economic goals, applying the two-step process described above.

Art. 5949(2) appears to satisfy the first step of the process because it is sufficiently specific—it is neither substantially over or underinclusive. The language of the statute provides that "[t]o be eligible for appointment as a Notary Public, a person shall be a resident citizen of the United States...." The restriction imposed by that language applies *solely* to persons seeking appointment as a notary public, and has no effect on or application to persons seeking appointment to any other state office or position. Thus, if anything, the Texas statute is much more precisely drafted[4] or "sufficiently tailored" than the California statute in *Cabell*—which defined the term "peace officer" to include over 70 different state jobs, ranging from dental board inspectors to park rangers to harbor police to welfare fraud investigators. Despite the seemingly overinclusiveness of the California statute (because of its effect on so many different kinds of state jobs), the *Cabell* Court found that the citizenship restriction there did not reach so far and so broad "as to belie the state's claim that it is only attempting to ensure that an important function of government be in the hands of those having the 'fundamental legal bond of citizenship.'" 454 U.S. at 442, 102 S.Ct. at 741.

The second step presents this question: Does a notary public in Texas exercise discretion in making decisions which substantially affect members of the political community? Whatever may be thought about the prestige of the office, the importance of the consequences of the official acts of the notary public to the government and courts of the state cannot be denied. The revised civil statutes of Texas contain many references to their deeds and duties. Art. 5954 grants this authority:

> Notaries Public shall have the same authority to take acknowledgments or proofs of written instruments, protest instruments permitted by law to be protested, administer oaths, and take depositions, as is now or may hereafter be conferred by law upon County Clerks....

In the stated areas, they possess authority identical to county clerks. With the power to acknowledge instruments such as wills and deeds and leases and mortgages; to take out-of-court depositions; to administer oaths; and the discretion to refuse to perform any of the foregoing acts, notaries public in Texas are involved in countless matters of importance to the day-to-day functioning of state government. The Texas political community depends upon the notary public to insure that those persons executing documents are accurately identified, to refuse to certify any identification that is false or uncertain, and to insist that oaths are properly and accurately administered. Land titles and property succession depend upon the care and integrity of the notary public, as well as the familiarity of the notary with the community, to verify the authenticity of the execution of documents.

Notaries certify to acknowledgements (art. 6602) of conveyances which admit the instruments to public record (art. 6626), and which record may in turn be the only evidence of authenticity if the original document is unavailable. (arts. 3726, 3726a). Wills signed and attested by the testator

---

**4.** The Court explained in *Cabell* that a state classification need not be "precise," but is sufficiently tailored to withstand a facial challenge to its constitutionality if it is merely a "substantial fit". 454 U.S. at 442, 102 S.Ct. at 741.

and two witnesses, if identified and sworn by a notary public, may be admitted to probate without any supporting proof. (Probate Code §§ 59, 84). The acknowledgments of notaries are admissible evidence of the facts recited therein. (arts. 3723, 6602). There are numerous instances where affidavits are required to insure accuracy and gravity of declarations, all depending in some measure upon the notary public who administers the oath: for example, suits on sworn account, judicially admissible business records and medical x-rays (art. 3737e) and recorded affidavits of heirship (art. 3726a). The courts of Texas give evidence and weight to the certificate of a notary public. "To impeach a notary's certificate, it has been held that the evidence must be clearly cogent and convincing beyond any reasonable controversy. *Griffin v. Stewart,* 348 S.W.2d 800 ([Tex.] Civ.App. [1961] n.w. h.)." *Hall v. Hayes,* 441 S.W.2d 275, 277 (Tex.Civ.App.—El Paso 1969, no writ).

■ We conclude that the office of a notary public in Texas is not a mere job or source of income, and that it is comparable to the positions of school teacher and police and probation officers in importance to the functioning of state government. The notary public may symbolize the power of the political community when administering a solemn oath or demanding certain proof of identity for the execution of a formal document. The citizenship restriction in art. 5949(2) bears a rational relationship to the state's interest in the proper and orderly handling of a countless variety of legal documents of importance to the state. Because Texas has a valid interest and right to define for itself the qualifications for the position of notary public, and because a citizenship requirement does not impermissibly violate equal protection guarantees in these circumstances, we uphold the constitutionality of art. 5949(2).

REVERSED.

INGRAHAM, Circuit Judge, concurring in part and dissenting in part:

I concur with much of the majority opinion, but I must respectfully dissent from its holding that Tex.Rev.Civ.Stat.Ann. art. 5949(2) is constitutional. I agree that the issues appear to have become moot with respect to Vargas and that they remain alive with respect to Bernal. Further, I agree that Bernal was not required to exhaust administrative remedies. I disagree, however, with the majority's conclusion that the district court erred in applying the strict scrutiny standard to determine the constitutionality of the statute. Therefore, with deference, I must respectfully dissent in part.

The responsibilities and duties of a notary public in Texas are more akin to the authority granted Connecticut lawyers, *see In re Griffiths,* 413 U.S. 717, 93 S.Ct. 2851, 37 L.Ed.2d 910 (1973), than the plenary powers given peace officers, *see Cabell v. Chavez-Salido,* 454 U.S. 432, 102 S.Ct. 735, 70 L.Ed.2d 677 (1982), state troopers, *see Foley v. Connelie,* 435 U.S. 291, 98 S.Ct. 1067, 55 L.Ed.2d 287 (1978), or school teachers. *See Ambach v. Norwick,* 441 U.S. 68, 99 S.Ct. 1589, 60 L.Ed.2d 49 (1979). As the Supreme Court noted, "a [Connecticut] lawyer has authority to 'sign writs and subpoenas, take recognizances, administer oaths and take depositions and acknowledgments of deeds.'" *In re Griffiths,* 413 U.S. at 723, 93 S.Ct. at 2855 (quoting Conn.Gen.Stat.Rev. § 51–85). Thus, the authority accorded Connecticut lawyers encompasses every function performed by Texas notaries public. *See supra* at 5972. The Supreme Court, however, has stated that "[i]t in no way denigrates a lawyer's high responsibilities to observe that [these duties] hardly involve matters of state policy or acts of such unique responsibility as to entrust them only to citizens." *Id.* at 724, 93 S.Ct. at 2856. Because the Supreme Court has held that states cannot require citizenship of lawyers, a profession whose responsibilities and duties comprehend more than those of the Texas notary public, I would apply the analysis of *In re Griffiths* to hold art. 5949(2) unconstitutional.

Despite the clear language in *Griffiths* declaring that the functions of notaries public are not of the character that justifies excluding noncitizens, the majority at-

tempts to distinguish the present case as representing a political function and therefore subject to a less demanding standard of review. This lower standard is permissible when the classification applies to a political office only because of "the recognition of the fact that a democratic society is ruled by its people ... [and the requirements that a political officer be a citizen] represents the choice, and right, of the people to be governed by their citizen peers." *Foley,* 435 U.S. at 296, 98 S.Ct. at 1071. The issue then becomes whether notaries public are governing officers. The Supreme Court clarified this inquiry in *Cabell* by stating that the classification could be applied only " 'to persons holding state elective or important nonelective executive, legislative, and judicial positions,' those officers who 'participate directly in the formulation, operation, or review of broad public policy' and hence 'perform functions that go to the heart of representative government.' " *Cabell,* 454 U.S. at 440, 102 S.Ct. at 740 (quoting from *Sugarman v. Dougall,* 413 U.S. 634, 93 S.Ct. 2842, 37 L.Ed.2d 853 (1973)). The Supreme Court goes on to state that "[w]e must therefore inquire whether the 'position in question ... involves discretionary decisionmaking, or execution of policy, which substantially affects members of the political community.' " *Id.* 454 U.S. at 441, 102 S.Ct. at 740 (quoting *Foley,* 435 U.S. at 296, 98 S.Ct. at 1070).

The majority, however, restates this inquiry as "Does a notary public in Texas exercise discretion in making decisions which substantially affect members of the political community?" *Supra* at 194. This reformulation focuses on whether notaries exercise any discretion in making the decisions associated with their duties rather than whether their duties involve discretionary decisionmaking or execution of policy, which would reveal a governing role. Accordingly, the majority emphasizes the importance of notaries in the proper and orderly handling of legal documents and their role in the smooth functioning of the state government. Nevertheless, this shifted focus illustrates the clerical nature of the duties of notaries public.

Moreover, when we examine the duties of Texas notaries to determine whether they involve discretionary decisionmaking or execution of policy, we find that notaries perform purely ministerial functions. Unlike the peace officers in *Cabell* or the state troopers in *Foley,* notaries public do not "partake of the sovereign's power to exercise coercive force over the individual." *Cabell,* 454 U.S. at 445, 102 S.Ct. at 743. Neither do notaries exercise the wide discretion enjoyed by teachers in presenting course materials that "inculcat[e] [the] fundamental values necessary to the maintenance of a democratic political system." *Ambach,* 441 U.S. at 77, 99 S.Ct. at 1594. Instead, the responsibility of the notary public is "to insure that those persons executing documents are accurately identified, to refuse to certify any identification that is false or uncertain, and to insist that oaths are properly and accurately administered." *Supra* at 194. While the accurate and conscientious performance of these duties are important for the smooth functioning of the state government, they do not "involve matters of state policy or acts of such unique responsibility as to entrust them only to citizens." *Griffiths,* 413 U.S. at 724, 93 S.Ct. at 2856.

Accordingly, I would affirm the district court decision holding Tex.Rev.Civ.Stat. art. 5949(2) unconstitutional.