**Luke JII, Plaintiff,**

v.

**James A. RHODES, et al., Defendants.**

**Civ. A. No. C–2–82–460.**

United States District Court, S.D. Ohio, E.D.

Sept. 2, 1983.

Luke Jii, pro se.

Thomas Martin, Asst. Atty. Gen., Thomas Sant, Columbus, Ohio, for defendants.

## OPINION AND ORDER

DUNCAN, District Judge.

Plaintiff Luke Jii, a permanent resident alien, instituted this action seeking to establish his right to become a notary public in the State of Ohio. More specifically, plaintiff seeks a declaratory judgment that R.C. 147.02 is unconstitutional under the Equal Protection Clause of the Fourteenth Amendment insofar as it requires applicants for appointment to the office of Notary Public to be citizens of the United States. Plaintiff has further requested that this Court permanently enjoin defendants from enforcing that statutory requirement.

### Jurisdiction

Plaintiff's action arises under the Fourteenth Amendment to the Constitution. This Court has jurisdiction under 28 U.S.C. § 1331(a) and has the power to issue the

requested declaratory judgment under 28 U.S.C. §§ 2201 and 2202.

### Parties

Plaintiff Jii is a resident of Columbus, Ohio, but is not a citizen of the United States. Defendant Celeste is the Governor of Ohio.[1] Defendant Columbus Bar Association (CBA) is the local organization charged with administering the notary public program.

### Procedural Background

Plaintiff Jii, proceeding *pro se*, filed his original complaint in May 1982, naming the Columbus Bar Association and the State of Ohio as defendants. In response to defendant's motions to dismiss and plaintiff's motion to amend his complaint, the Court dismissed the complaint as against the State of Ohio and allowed plaintiff to amend his complaint to name James A. Rhodes, the then Governor of the State of Ohio, as defendant.

Cross motions for summary judgment were then filed by both plaintiff Jii and defendant Rhodes. Because the Court believed the pleadings were inadequate, a ruling on the motions was postponed pending further briefing. More specifically, defendants were granted 20 days in which to submit supplemental briefs addressing three issues of concern to this Court: (a) the proper scope of constitutional scrutiny in this case; (b) the justification for the citizenship requirement under both the "strict scrutiny" and "rational basis" tests; and (c) the grounds, if any, for distinguishing Ohio's citizenship requirement from those which have been held unconstitutional in other states.[2] The defendant Columbus Bar Association chose not to provide the requested information and instead filed a supplemental brief which stated that while its Notary Public Committee administered the law, the Bar Association took no position with respect to the constitutionality of R.C. 147.02. Defendant Rhodes, con-

sistent with the apparent lack of interest in or concern with this case, supplemented his original pleadings with an equally terse brief.

This case is once again before the Court for a decision on the parties' cross-motions for summary judgment.

For the reasons that follow, the Court finds that R.C. 147.02, which requires all notaries public to be citizens of the United States, violates the Equal Protection Clause of the Fourteenth Amendment and is therefore unconstitutional. Accordingly, plaintiff's motion for summary judgment is granted and defendants' motions are denied.

### Facts

There is no dispute as to any of the material facts in this case. Plaintiff Jii applied to the Columbus Bar Association for a notary public commission in February 1982. Plaintiff's application was denied because he was not registered to vote as required by a CBA rule. The CBA rule is based on R.C. 3503.01 and R.C. 147.02, which make United States citizenship a prerequisite for voter registration and notary public commissions. Under these provisions, plaintiff is precluded from becoming a notary in the State of Ohio.

A notary public is an officer whose duty it is to attest to the genuineness of deeds or writings in order to render them available as evidence of the facts therein contained. 58 Am.Jur.2d. In Ohio, notaries are appointed by the Governor. R.C. 147.-01. The appointment is made upon a certificate from a Judge of the Court of Common Pleas, Court of Appeals, or Supreme Court, who attests to the good moral character of the applicant; that the applicant possesses the qualifications and abilities to discharge the duties of the office and that the applicant is a citizen of the county in which he resides. R.C. 147.02. The Governor may appoint and commission as notaries public

---

**1.** Governor Celeste has been substituted for Governor Rhodes who was governor when plaintiff originally filed this action.

**2.** *See,* cases cited in note 3, *supra.*

as many applicants as he considers necessary, who are citizens of this state, and who are 18 years of age or older. R.C. 147.01. Pursuant to R.C. 147.07 a notary public in Ohio may administer oaths required or authorized by law; take and certify depositions; take and certify acknowledgments of deeds, mortgages, liens, powers of attorney, and other instruments of writing; and receive, make and record notarial protests. Furthermore, in taking depositions, notaries shall have the power to compel the attendance of witnesses and to sanction a witness for refusing to testify.

■ A notary public is a ministerial officer, as that term has been understood so long that "the memory of man runneth not to the contrary." *Ex parte Bevan,* 126 Ohio St. 126, 130, 184 N.E. 393, 397, *aff'd.,* 289 U.S. 459, 53 S.Ct. 661, 77 L.Ed. 1316 (1933). Thus the power of a notary to commit a witness to jail has been declared ministerial, not judicial, in the sense of the Constitution which confers all judicial power upon the courts. *DeCamp v. Archibald,* 50 Ohio St. 618, 620, 35 N.E. 1056, 1058 (1893). In addition, the Ohio courts have declared that the taking of an acknowledgment is a ministerial, not a judicial, act. *Ford v. Osborne,* 45 Ohio St. 1, 12 N.E. 526 (1887). While notary publics were at one time considered to be state officers exercising governmental functions, *Bettman v. Warwick,* 108 F. 46 (6th Cir.1901), it is now agreed that insofar as the appointment of notaries public is provided for by statute, they are public officials. *State ex rel. Smith v. Johnson,* 12 Ohio App.2d 87, 231 N.E.2d 81 (1967).

Having briefly surveyed the historical and present day significance of the office of notary public, the Court now finds it necessary to address the critical legal issues raised by this declaratory judgment action. The decision in this case turns initially upon the resolution of two key issues. First, it is necessary to determine the proper standard of review or level of scrutiny this Court should use in evaluating the statute in question. Second, the Court must determine whether the statute withstands constitutional scrutiny.

After having carefully analyzed the statute in question, this Court is of the opinion that the Ohio statute cannot withstand plaintiff's constitutional challenge. In this respect, the Court notes that it does not believe the level of scrutiny employed is outcome determinative since the Court reaches the same conclusion even when using the rational basis standard of review.[3]

### Discussion

■ For nearly 100 years lawfully admitted aliens have been considered "persons" within the meaning of the Fourteenth Amendment and thus entitled to equal protection of the laws. *Yick Wo v. Hopkins,* 118 U.S. 356, 369, 6 S.Ct. 1064, 1070, 30 L.Ed. 220 (1886). There were, however, certain instances where classifications based on alienage withstood constitutional scrutiny. A brief survey of the legal history of discrimination based on alienage may prove helpful to an understanding of this Court's decision.

Historically, discrimination based on alienage fell into one of three categories: restrictions on an alien's ability to work; discrimination in the distribution of state benefits; and citizenship requirements for state employees. In evaluating classifications based upon alienage the courts generally distinguished between classifications for the purposes of distribution of public resources, *see, e.g., Patsone v. Pennsylvania,* 232 U.S. 138, 34 S.Ct. 281, 58 L.Ed. 539 (1914); *Heim v. McCall,* 239 U.S. 175, 36 S.Ct. 78, 60 L.Ed. 206 (1915); and classi-

---

**3.** It seems fairly apparent that the citizenship requirement for notaries public cannot withstand "strict scrutiny" if that were the standard of review used by this Court. A number of courts have so held. *See, e.g., Graham v. Romani,* 383 So.2d 634, 638 (Fla.1980); *Taggart v. Mandel,* 391 F.Supp. 733 (D.Md.1975); *Cheng v. Illinois,* 438 F.Supp. 917 (N.D.Ill.1977). The defendants in this case have presented the Court with no argument or support which would convince the Court that the rule should be or is otherwise.

fications arbitrarily created by the government to be used for reasons other than distribution of public resources. *See, e.g., Truax v. Raich*, 239 U.S. 33, 36 S.Ct. 7, 60 L.Ed. 131 (1915); *Yick Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). The former type of classification was often deemed permissible while the latter was not.

The distinctions of these earlier cases became less clear after the decision in *Takahashi v. Fish & Game Commission*, 334 U.S. 410, 68 S.Ct. 1138, 92 L.Ed. 1478 (1948), wherein the Supreme Court struck down a California statute which prohibited aliens from receiving a license for offshore fishing. In *Takahashi*, the Supreme Court found that "the power of a state to apply its laws exclusively to alien inhabitants as a class if confined within narrow limits." *Id.* at 420, 68 S.Ct. at 1143. Prior to this decision, the Supreme Court had almost uniformly held that this form of discrimination did not violate the Fourteenth Amendment because states had a "special public interest" in regulating the use of natural resources. *See, e.g., Terrace v. Thompson*, 263 U.S. 197, 44 S.Ct. 15, 68 L.Ed. 255 (1923); *Patsone v. Pennsylvania*, 232 U.S. 138, 34 S.Ct. 281, 58 L.Ed. 539 (1914).

Despite the Supreme Court's decision in *Takahashi* many courts continued to apply the special public interest doctrine. The death knell for the "private-public" distinction was apparently sounded in *Graham v. Richardson*, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971). In *Graham*, the Supreme Court invalidated an Arizona statute that denied certain benefits to resident aliens. In so doing, the court specifically held that a state cannot discriminate against aliens in the distribution of state benefits without showing that the discrimination is necessary to further a compelling governmental interest.

The reasoning and holding of *Graham* was subsequently extended to efforts to limit eligibility for state higher education loans and grants to United States citizens, *Nyquist v. Mauclet*, 432 U.S. 1, 97 S.Ct. 2120, 53 L.Ed.2d 63 (1977), and to efforts to deny public education to illegal aliens, *Plyer v. Doe*, 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982).

In 1973 nearly two years after *Graham* established the strict scrutiny standard of review in alienage cases, the Supreme Court created a narrow exception to the *Graham* analysis. Specifically, the court held that in limited circumstances states could bar aliens from state or public employment. *Sugarman v. Dougall*, 413 U.S. 634, 93 S.Ct. 2842, 37 L.Ed.2d 853 (1973).

In *Sugarman* the court upheld the right of a state to exclude aliens from competitive state civil service jobs and recognized a state's interest in limiting participation in its government to those within its political community. *Id.* at 642, 93 S.Ct. at 2847. While reaffirming the view that restrictions that essentially affect economic interests of aliens are still subject to heightened scrutiny, the court in *Sugarman* nonetheless concluded that when restrictions serve a "political function" of the state, then strict scrutiny is inappropriate.

Since *Sugarman*, the so-called "political function" exception has been used to exclude aliens from state grand juries. *Perkins v. Smith*, 426 U.S. 913, 96 S.Ct. 2616, 49 L.Ed.2d 368 (1976); to prohibit aliens from serving as state troopers, *Foley v. Connelie*, 435 U.S. 291, 98 S.Ct. 1067, 55 L.Ed.2d 287 (1978); and to restrict eligibility to teach public school to citizens or aliens who had applied for citizenship, *Ambach v. Norwick*, 441 U.S. 68, 99 S.Ct. 1589, 60 L.Ed.2d 49 (1979). Although the "political function" exception has been used to restrict aliens from positions which are at the heart of representative government or closely bound up with the operation of the state government, it has been held not to extend to restrictions which excluded noncitizens from admission to the bar. *In re Griffiths*, 413 U.S. 717, 93 S.Ct. 2851, 37 L.Ed.2d 910 (1973), which denied noncitizens civil engineering licenses; *Examining Board v. Flores de Otero*, 426 U.S. 572, 96 S.Ct. 2264, 49 L.Ed.2d 65 (1976); and to efforts to bar certain resident aliens from

state educational financial assistance, *Nyquist v. Mauclet*, 432 U.S. 1, 97 S.Ct. 2120, 53 L.Ed.2d 63 (1977).

In sum, the court, in creating the narrow exception of *Sugarman* and its progeny, recognized and accepted the state's need to define its political community. Stated yet another way, "some state functions are so bound up with the operation of the state as a government entity as to permit the exclusion from those functions of all persons who have not become a part of the process of self government." *Ambach v. Norwick, supra*, 441 U.S. at 73–74, 99 S.Ct. at 1593. In those cases, the state's exclusion of aliens is subject to a lower standard of review.

The Supreme Court recently reaffirmed its commitment to the "government function" exception in the case of *Cabell v. Chavez-Salido*, 454 U.S. 432, 102 S.Ct. 735, 70 L.Ed.2d 677 (1982). In *Cabell*, the Court, while reaffirming the rule that classifications based on alienage are inherently suspect, nonetheless held that a state may require a deputy probation officer to be a citizen of this country and that such positions fall within the "political function" exception as established in *Sugarman*. More specifically, the Court held that states may limit or bar aliens from holding certain public offices where such offices are involved in the formulation, execution or review of public policies or where such offices require the exercise of broad discretion. *Cabell, supra*, 454 U.S. at 435–443, 102 S.Ct. at 737–741.

> *Sugarman* advised that a claim that a particular restriction on legally resident aliens serves political and not economic goals is to be evaluated in a two step process. First, ... the classification will be examined: a classification that is substantially overinclusive or underinclusive tends to undercut the government claim that the classification serves legitimate political ends .... Second, even if the classification is sufficiently tailored, it may be applied in a particular case only to ... [those persons that] 'perform functions that go to the heart of representative government.' We must therefore inquire whether the position in question involves discretionary decisionmaking or execution of policy which substantially affects members of the political community.

*Cabell, supra*, 454 U.S. at 440–441, 102 S.Ct. at 740.

It is upon the *Sugarman-Cabell* "government function" exception that the defendants in this case seek to hang their hats. Specifically, defendants appear to be contending that notaries public exercise "governmental functions" which are intimately related to the state's sovereignty. Without further explanation,[1] the defendants claim that because notaries public represent the sovereign state, the citizenship requirement of R.C. 147.02 clearly withstands constitutional scrutiny. For the reasons set forth more fully below, the Court cannot agree.

Under the *Sugarman* decision, as has already been noted, the Court must first carefully examine the classification to insure that it is not substantially overinclusive or underinclusive. Initially, in this case, aliens are prohibited from serving as notaries public. This classification is arguably narrowly tailored and does not sweep indiscriminately so as to be over- or underinclusive. In any event, we will assume that the first prong of the two-pronged *Sugarman* analysis has been satisfied with respect to this citizenship requirement.

**4.** In this Court's order of December 22, 1982, defendants were specifically asked to provide the Court with additional support for the application of *Cabell* to these facts. The Court went so far as to set out specific questions and concerns it had concerning the citizenship requirement at issue in light of *Cabell*. Nonetheless, the defendants in their supplemental pleadings, have failed to provide the Court with any significant additional argument or analysis in support of their position. While the Court will not make defendants' arguments for them, the Court does note that it has carefully undertaken an independent review and analysis of the *Cabell* decision. Based upon its analysis, the Court concludes that the Ohio citizenship requirement for notaries public is unconstitutional.

It is clear, however, that even if the classification is sufficiently tailored, it may be applied only to "persons holding state elective or important nonelective executive, legislative and judicial positions," those officers who "participate directly in the formulation, execution, or review of broad public policy" and hence "perform functions that go to the heart of representative government." *Sugarman, supra,* 413 U.S. at 647, 93 S.Ct. at 2850.

This Court concludes that the opposition of notary public does not involve "discretionary decisionmaking, or execution of policy which substantially affects members of the political community." *Foley v. Connelie,* 435 U.S. 291, 296, 98 S.Ct. 1067, 1071, 55 L.Ed.2d 287 (1978). As has been previously noted, the law in Ohio is clear that the various functions, duties and powers of notaries public under R.C. 147.07, including any contempt powers, are ministerial in nature and therefore cannot reasonably be deemed to be governmental or sovereign functions from which non-citizens need be excluded. While it is true that attesting to the authenticity of documents and administering oaths may be viewed by many as official acts, these functions while somewhat formal or official are not of such importance to the state or sovereign so as to be deemed to go to the heart of the concept of democratic self-government. This court simply believes that the duties of a notary public are closer in quality and character to the functions of an attorney, *In re Griffiths, supra,* 413 U.S. at 727, 93 S.Ct. at 2857–2858 (cannot exclude noncitizens from admission to the bar), rather than to the functions of police or probation officers. *Cf., Cabell, supra,* 454 U.S. at 443, 102 S.Ct. at 741–742. This Court simply believes that a state's interest in setting the qualifications for notaries is analogous to the states' interest in licensing any of the common occupations or professions. Such an interest does not fall within the government function exception.

The Court is cognizant of the recent decision of the Fifth Circuit in *Vargas v. Strake,* 710 F.2d 190 (1983), reaching the opposite conclusion. Therein the court, speaking through Judge Reavley, concluded that "the office of a notary public in Texas is not a mere job ... [but rather] is comparable to the position of ... probation officers in importance to the functioning of state government." In concluding that the citizenship requirement was constitutional, the court in *Vargas* relied largely on the fact that notaries public handle important legal documents which are of some consequence to the courts of the state and the government. With all due respect to the Fifth Circuit, this court continues to believe that the Ohio citizenship requirement is unconstitutional. As the dissent in *Vargas* noted a state cannot require citizenship of lawyers, whose duties and responsibilities certainly comprehend more than those of a notary public. By the same token, the state should not be permitted to require citizenship of notaries public.

■ In conclusion, while it is true that the state may be justified in totally restricting aliens' access to certain positions or offices, in so doing it should be evident that the position in question is a personification of the state's power or that the position, be it teacher, police officer or probation officer, requires the performance of some functions regulation of which is necessary "to preserve the basic conception of a political community." *Cabell v. Chavez-Salido, supra,* 454 U.S. at 440–41, 102 S.Ct. at 740–741 (probation officers may be required to be citizens); *Foley v. Connelie,* 435 U.S. at 294–96, 98 S.Ct. at 1069–1070 (prohibit aliens from serving as state troopers); *Ambach v. Norwick,* 441 U.S. at 68, 72, 99 S.Ct. at 1589, 1592 (citizenship requirement for public school teachers upheld).

■ The Court cannot therefore conclude that the position of notary public falls within the "government function" exception established in *Sugarman* thus justifying a departure from the "strict scrutiny" standard of review.

■ The Court would ordinarily conclude its analysis at this point. However, the Court deems it prudent to note at this point

that even were this Court to assume that the position of notary public was such as to fall within the "government function" exception, it would still be necessary to inquire whether Ohio's citizenship requirement for notaries had some rational basis.[5] In other words, when an office or profession is found to come within the government function exception, then the standard of review used to determine the constitutionality of restrictions an alien's engaging in that profession is not quite so exacting. *Sugarman, supra,* 413 U.S. at 642, 93 S.Ct. at 2847. Nonetheless, the Court is required to subject such restrictions to some form of scrutiny[6] and at the very least such restrictions must have a rational basis.

■ In this case, the state has utterly failed to demonstrate that citizenship bears any relationship to the special demands of the particular position of notaries public. *See, Taggart v. Mandel,* 391 F.Supp. 733 (D.Md.1975). Rather the defendants, without further explanation, simply state that the citizenship requirement is needed because notaries perform sovereign functions. Absent some further explanation, the Court is unconvinced that the citizenship requirement for Ohio's notaries public is in any way related to the achievement of some valid state objective. The Court, therefore, concludes that the citizenship requirement for notaries public found in R.C. 147.02 violates the Equal Protection Clause of the Fourteenth Amendment. The citizenship requirement is hereby declared unconstitutional.

5. It is clear, of course, that if the statutory provision in question is unconstitutional under the "rational basis" test, then it would also be unconstitutional under a "strict scrutiny" test. *See also,* note 1, *supra.*

6. The Court finds it necessary to note at this point that the precise level of scrutiny to be used under *Sugarman* is not made at all clear in the opinions of the Supreme Court. At the very least it is something "less than strict scrutiny." *Cabell, supra,* 454 U.S. at 439, n. 6, 102 S.Ct. at 739, n. 6. However, it remains unclear as to whether the standard of review is merely "rational basis" or something in between rational

*Conclusion*

In accordance with the discussion above, plaintiff's motion for summary judgment is GRANTED and defendants' motions for summary judgment are DENIED. The Clerk of Court is directed to enter judgment for the plaintiff in this matter.

So ORDERED.

basis and strict scrutiny. For purposes of this opinion, we are assuming without deciding that when the "government functions" exception applies, a rational basis standard of review applies. Since it is clear that, using a rational basis standard of review, the government has failed to show a rational basis for the citizenship requirement, that requirement must fall. *See* discussion appearing in text. Of course, it thereby becomes apparent that if the citizenship requirement is constitutionally infirm under a rational basis standard of review, that requirement would also be unconstitutional under a more exacting standard of review.